Seymour SACKS; Star Sacks,
Petitioners–Appellants,

v.

COMMISSIONER, INTERNAL
REVENUE SERVICE,
Respondent–Appellee.

Michael R. GEYSER; Joyce Geyser,
Petitioners–Appellants,

v.

COMMISSIONER, INTERNAL
REVENUE SERVICE,
Respondent–Appellee.

Nos. 93–70401, 93–70724.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1994.

Decided Oct. 31, 1995.

Richard C. Onsager, Jennings, Strouss & Salmon (on the briefs), Phoenix, Arizona; and Robert J. Lord, Sacks, Tierney & Kasen, (argued), Phoenix, Arizona, for petitioners-appellants.

Gary R. Allen, (on the briefs), and Thomas J. Clark, (argued), Tax Division, United States Department of Justice, Washington, D.C., for respondent-appellee.

Before: GOODWIN, O'SCANNLAIN and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Mr. Sacks invested in solar energy devices. The Internal Revenue Service disallowed his depreciation deductions and investment tax credits on the ground that his sale and lease-back transactions were shams. The IRS prevailed in Tax Court, but we reverse.

## I. FACTS

In the 1970's, after the country suffered through the Arab oil embargo and a sharp increase in the price of oil, some people thought that the world would run out of oil, or at least that prices would continue to

increase. An environmental theory developed, during the 1960's and 1970's, that "the unrestrained burning of cheap fossil fuels" might also damage the earth's atmosphere. Albert Gore, *Earth In the Balance* 6 (1992). Many people also thought that the double digit inflation rates of the late 1970's would continue indefinitely into the future. Others disagreed, arguing that the 1980's price increases would induce investors to bring new supplies of fossil fuels onto the market and that, like most cartels, the oil cartel would collapse. People in high positions differed in their views. Many prominent politicians, journalists, and professors predicted permanent inflation and permanently rising energy prices.

Congress responded to this apprehension, and passed tax and other laws to mitigate the perceived crisis. The House Ad Hoc Committee on Energy stated that:

> there is widespread agreement that a continuation of present world oil consumption trends, even with significantly higher world oil prices, will lead to a very tight world oil market in the mid–1980's. At that point, the world's oil supply will be straining to meet world demand with very serious implications for both international security and the world economy. Sudden disruptive price increases, accompanied by arbitrary curtailments of supply, will generate shocks to the national security and economic stability of each oil importing country.

H.R.Rep. No. 95–543, 95th Cong. 1st Sess., 1978 U.S.C.C.A.N. 7673, 7675 (explaining the reasons for the National Energy Act). Congress passed a package of tax and other laws to encourage people to invest in windmills, solar energy, geothermal energy, and other alternative energy sources, and to discourage "gas guzzler" automobiles and other petroleum consumption. *See, e.g.,* 26 U.S.C. §§ 44C, 44D, 44E, 46(a)(2)(C); S.Rep. No. 95–442, 95th Cong. 2nd Sess., 1978 U.S.C.C.A.N. pp. 7855, 7903; H.R.Rep. No. 95–543.

The State of Arizona also enacted legislation providing tax incentives for investment in alternative energy. The Arizona Solar Energy Commission published a report in 1983, submitted as an exhibit in this case. The report said that no one knew what future utility rates would be, but that it was unlikely that any future change could make solar heating an unwise investment because "electricity prices have increased nearly 200% over the last ten years" and have generally risen about 1½ times as fast as inflation. Arizona Solar Energy Commission, *Solar Water Heating For Arizona Homes* 8 (1983). The electric utilities serving Phoenix had unsuccessfully sought a rate increase to cover construction costs for a nuclear power plant, and some people thought that once the nuclear plant went on-line, the rate base would double and dramatically increase electricity costs. *Sacks v. Commissioner,* 64 T.C.M. (CCH) 1003, 1004, 1992 WL 252948 (1992).

These new state and federal tax incentives worked as intended to induce Mr. Sacks, a lawyer in Phoenix, and his client and friend, Bertram Trobman, to invest in the solar heating of water. Mr. Trobman learned that affluent families had invested in solar water heating equipment, but not homeowners with less money, because the cash outlay to buy and install a solar heater was too great. He studied the market for household equipment rented to families of moderate means and learned that once they rented an appliance, they typically made monthly payments indefinitely and continued to use it as long as it lasted. He discovered that Amcor, a large Israeli company, had been selling solar devices since 1947, and had been selling solar water heating units around the world since 1965.

After studying the Amcor units at trade shows and at the factory in Israel, Mr. Trobman agreed to buy five hundred 64 gallon units for $1,080 to $1,180 each, including the necessary heating elements for cloudy days, pumps and timers. Amcor gave five year warranties on the units, and later extended the warranties to ten years. Mr. Trobman guessed that the useful life of the units on houses would be about twenty years because they were more like plumbing than anything else.

Mr. Trobman did not propose to finance this half million dollar purchase and the sub-

sequent placement of the units on houses all by himself. He organized a corporation, BFS Solar Incorporated, and enlisted his friend and lawyer Mr. Sacks as one of the investors. BFS Solar's 1983 prospectus offered to sell each unit to investors for $4,800, and then to lease it back. The investors would get a base rent for 53 months of $1,327.80, plus a percentage of what homeowners paid to have the units on their roofs. The investor would pay $2,400 down in cash and $2,400 pursuant to a ten year, 9% note. The investor would be personally liable on the note. He would get no nonrecourse financing.

Assuming a fifteen year useful life of the solar water heaters, investors would make profits ranging from $458 based on the Tax Court's assumptions about energy inflation rates and other factors, to $7,782 based on the historical energy inflation rate of 11.5% annually. Assuming the twenty year useful life projection that BFS Solar estimated, and the 11.5% historical energy inflation rate, the investor's profit would be $34,776. All these projections were necessarily speculative, because both Amcor's technology and BFS Solar's plan for making money from it were novel for Arizona. As we all know now, the underlying assumption that the price of oil would rise rapidly into the mid–1980's was mistaken, so all these projections were mistaken. Quite possibly, the solar water heaters will not earn their cost, let alone earn profits at high, speculative rates.

One naturally wonders why investors participating in a genuine purchase of solar water heaters would pay a price of $4,800 for heaters Mr. Trobman could buy in Israel and bring to Arizona for roughly $1,100. The Tax Court found that the $4,800 price "was about the middle of the range of prices for other solar water heaters that were being sold directly to homeowners at retail prices at that time." *Sacks,* 64 T.C.M. (CCH) at 1008. The Tax Court found that retail prices for the water heater installed on a roof in Arizona "would range from $3,000 to $5,670," and the "very high markups" resulted from high marketing expenses to promote the new technology, high expenses, profit, and the lack of any industry standard for markups at

that time. *Id.* at 1018. Later in the 1980's "a standard 40% markup developed." *Id.*

Mr. Trobman arranged for the units to be leased to middle class homeowners with houses in the $35,000 to $100,000 price range. The market had to be affluent enough to rent the units, but not so affluent that the homeowners would prefer to buy them outright. Lease revenue from the homeowners was expected to be at least $24 per month per unit, after a two year period in which no rent would be charged. The rents were to rise in tandem with the expected rise in oil prices.

Mr. Sacks learned of Mr. Trobman's plan from other people at his law firm. He had no involvement in preparing the plan. At the end of 1982, Mr. Sacks invested in ten units. He entered into a purchase agreement under which he paid $24,000 in cash and short term promissory notes, and gave BFS Solar 9% promissory notes for the rest, for a total of $48,000 plus interest. These notes were negotiable, and the holder would have full recourse against Mr. Sacks personally for the entire amount.

Mr. Sacks also entered into a 53–month net lease agreement with BFS Solar. The lease agreement had two components. First, Mr. Sacks would receive $12,029.50 base rent for BFS Solar's use of the heaters, prorated over the 53 months. The monthly rent would start at $10.20 per unit in the beginning of the lease period and increase to $33.35 per unit by the end. Second, Mr. Sacks was to receive 50 percent of the amount by which income from subleases to homeowners exceeded BFS Solar's monthly base rent obligation.

Mr. Sacks also entered into a management services agreement with BFS Corporation (as distinguished from BFS Solar). For 15% of gross rents received from homeowners, BFS was to manage the flow of rents and disbursements and provide accounting services to the investors.

Homeowners leased the units for 24 months. They paid $576 for installation, no rent for two years, and then would decide whether to continue renting the units, at a rate which Mr. Trobman expected to peg somewhat below what conventionally heated

water would have cost. Mr. Trobman's expectation was that once the unit was installed, the homeowner would keep it and pay monthly rent after the rent-free period expired, because solar hot water would be cheap compared to electrically heated water, and it would be a nuisance to have the unit removed. But if this expectation turned out to be too optimistic, Mr. Trobman would still be liable to Mr. Sacks for the base rent, and Mr. Sacks would still be personally liable for the full amount of the notes.

All ten units bought by Mr. Sacks and leased back to BFS Solar were actually leased to homeowners. The solar heating business was not mere paper. *Cf. Cook v. Commissioner*, 941 F.2d 734 (9th Cir.1991). The metal and glass existed and was placed into use on houses for solar water heating.

In 1983, Mr. Sacks bought another five units. A similar sale and leaseback transaction, and a similar management agreement, were used. These five units were also real, and were leased to homeowners.

Mr. Sacks claimed depreciation and investment tax credits for the units on his 1983, 1984, and 1985 tax returns. The Commissioner disallowed these deductions and credits, and asserted deficiencies on the ground that the sale leaseback transactions were shams. The Tax Court sustained the Commissioner's determination, and Mr. Sacks appeals.

## II. ANALYSIS

Mr. Sacks was entitled to his claimed depreciation deductions and investment tax credits (both regular and business energy) on the solar energy equipment only if the equipment was "used in the trade or business" or "held for the production of income." 26 U.S.C. §§ 48(a), 167(a). The Tax Court held that the equipment was not so used, and therefore Mr. Sacks was not entitled to the deductions and credits, because his investment was a sham transaction.

### A. Standard of Review.

The critical issue in this case is whether the Tax Court erred in deciding that the sale-leaseback transaction between BFS Solar and Mr. Sacks was a sham. Our standard of review is not entirely clear. We have held that we review such a determination for clear error, *Erhard v. Commissioner*, 46 F.3d 1470, 1476 (9th Cir.1995), but we have also noted the Supreme Court's holding that "the general characterization of a transaction for tax purposes as a sham is a question of law" subject to review *de novo. Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n. 16, 98 S.Ct. 1291, 1302 n. 16, 55 L.Ed.2d 550 (1978), discussed in, *Casebeer v. Commissioner*, 909 F.2d 1360, 1362 n. 6 (9th Cir. 1990). We reconcile these authorities by construing them to mean that the underlying factual determinations are reviewed for clear error, but the correctness of the legal standards applied by the Tax Court, and the application of the legal standards to the facts found, are reviewed *de novo*.

### B. Sham Transactions Generally.

It has long been the law that a transaction with no economic effects, in which the underlying documents are a device to conceal its true purpose, does not control the incidence of taxes. *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). As Judge Learned Hand explained, where the "intent[ ] or purpose[ ] was merely to draught the papers, in fact not to create corporations" this purpose defeated the intended tax benefit. The intent which caused the transaction to be a sham was "not the accompanying purpose to escape taxation; that purpose was legally neutral." *Chisholm v. Commissioner*, 79 F.2d 14, 15 (2d Cir. 1935).

In a sale-leaseback transaction, the seller of property typically intends to possess it, yet sells the property to another, who leases it back. Whether a sale-leaseback is mere paper shuffling, a sham not entitled to tax recognition, or a genuine transaction so that the buyer-lessor may deduct depreciation and take tax credits, depends on the circumstances. The Supreme Court upheld, against the Commissioner's challenge, tax deductions taken by the paper owner in a sale-leaseback transaction in *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978).

In *Frank Lyon*, a bank wanted to build a new building, but could not proceed as it wished because of regulatory limitations. After obtaining a commitment from a third party to loan 95% of the expected costs of the building, the bank arranged with one of its board members, Mr. Lyon, for him to be the owner. Mr. Lyon paid 5% of the purchase price with his own money, and borrowed 95% from the third party lender the bank had located. The bank constructed the building, sold it to Mr. Lyon's company, and leased it back. Mr. Lyon's company was to have no maintenance or other ordinary landlord duties. The bank's lease payment to Mr. Lyon's company was equal to his mortgage payment to the third party lender. The bank retained an option to buy the building from Mr. Lyon's company for what he had in it, that is, the balance on his mortgage to the third party lender, his 5% down, plus 6% interest compounded on his 5% down. With such an option, the bank was positioned to take advantage of any appreciation in the value of the building, so Mr. Lyon could not expect to profit from his ownership beyond the agreed upon interest.

The Commissioner took the position that the sale and leaseback was a sham, a financing device dressed up as ownership, so Mr. Lyon's company was not the owner for tax purposes and was not entitled to the depreciation deductions and other tax benefits of ownership. The investor's motivation was mixed, to benefit from a tax shelter and to diversify his investment portfolio.

The Supreme Court held for the taxpayer, Mr. Lyon's company. In so holding, the Court said "most significantly" the investor, and not the bank, was personally liable on the loan to the third party lender. *Id.* at 577, 98 S.Ct. at 1300. The investor's personal liability was significant because he had a "real and substantial risk" such that, "should anything go awry" in the plan to have the bank's rent always cover the obligation on the note, the investor's capital and assets were exposed. *Id.* It also mattered to the decision that the depreciation deductions were not created ex nihilo by paper shuffling; the bank would have been entitled to them if

the investor had not purchased the real estate. *Id.* at 580, 98 S.Ct. at 1302.

The Court expressly rejected the proposition that the investor's tax motive furnished grounds for disallowing the tax benefits:

> The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction. *See Commissioner of Internal Revenue v. Brown*, 380 U.S. 563, 579–580, 85 S.Ct. 1162 [1170–1171], 14 L.Ed.2d 75 (1965) (Harlan, J. Concurring).

*Id.* The reference to Justice Harlan's concurrence is for the proposition that taxes are part of the environment for every business transaction, so tax consequences are legitimately considered in genuine transactions:

> Were it not for the tax laws, the respondents' transaction with the Institute would make no sense, except as one arising from a charitable impulse. However the tax laws exist as an economic reality in the businessman's world, much like the existence of a competitor. Businessmen plan their affairs around both, and a tax dollar is just as real as one derived from any other source.

*Commissioner v. Brown*, 380 U.S. 563, 579–80, 85 S.Ct. 1162, 1170–71, 14 L.Ed.2d 75 (1965) (Harlan, J., concurring).

■ "Tax recognition is generally denied to paper losses in transactions having no economic effect...." *Cook v. Commissioner*, 941 F.2d 734, 738 (9th Cir.1991). We held in *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir.1988), that a commodity straddle transaction was a sham because it had no "practical economic effects other than the creation of income tax losses." *Id.* at 354. We stated that although the proper test to apply to a sham question is not a "rigid two step analysis," we typically focus on the subjective aspect of whether the taxpayer intended to do anything other than acquire tax deductions, and the objective aspect of whether the transaction had any economic substance other than creation of tax benefits.

We noted in [*Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543 (9th Cir.1987)] that courts "typically focus" on the related factors of whether the taxpayer has shown 1) a non-tax business purpose (a subjective analysis), and 2) that the transaction had "economic substance" beyond the generation of tax benefits (an objective analysis). 820 F.2d at 1549. However, we did not intend our decision in *Bail Bonds* to outline a rigid two-step analysis. Instead, the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses.

*Id.* at 354. We have repeatedly and carefully noted that this formulation cannot be used as a "rigid two-step analysis." *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990).

We held that a sale-leaseback was a sham in *Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir.1990). In *Casebeer*, a computer leasing company sold computers to investors and leased them back. The computers were already leased out to end users. The investors gave recourse and nonrecourse notes to the computer leasing company, and assumed nonrecourse debt owed by the company to the banks which financed the original purchase. The investors were to pay the leasing company on the nonrecourse notes the same amount which the leasing company was supposed to pay the investors to rent the computers from them. *Id.* at 1361. We affirmed the Tax Court's determination that these sale-leasebacks were shams. When we penetrated the papers ostensibly selling and leasing back the computers, it became clear that the investors had nothing at risk and nothing to gain except tax benefits. The computer company retained all of the benefits and risks of ownership.

C. *Was Sacks' Sale–Leaseback a Sham?*

■ Our analytic task is to decide whether Mr. Sacks' sale and leaseback was more like *Frank Lyon*, or more like *Casebeer*. We conclude that it was more like *Frank Lyon*.

Factors which demonstrate that Mr. Sacks' deal had genuine economic effects, and was not a sham, are that (1) Mr. Sacks' personal obligation to pay the price was genuine; (2) he paid fair market value; (3) the tax benefits would have existed for someone, either BFS Solar or Mr. Sacks, so the transaction shifted them but did not create them from thin air; (4) the business of putting solar water heaters on homeowners' roofs was genuine; and (5) the business consequences of a rise or fall in energy prices and solar energy devices were genuinely shifted to Sacks by the transaction.

This is not to say that all these factors, or only these factors, are necessary to make a sale-leaseback genuine, or that these factors would suffice in all cases. The high stakes in tax cases, and the high intelligence of tax lawyers, makes it impossible to have a simple checklist or rigid formula for determining whether a transaction is a sham. In this case, the factors listed demonstrate that the sale-leaseback had "practical economic effects," *Sochin*, 843 F.2d at 354, in addition to the shifting of tax benefits. Mr. Sacks had a business purpose, making money after taxes by leasing out solar water heaters, and the sale-leaseback had economic substance, in that it shifted part of the speculative risk of homeowners' nonpayment and decline in energy prices from Mr. Trobman's company to Mr. Sacks.

1. *Personal Liability for the Price.*

In the ideal tax shelter from a taxpayer's point of view, but not the government's, the taxpayer shows a deductible expense on paper, without actually suffering any of the ordinary economic consequences of paying the money. The simplest device for creating spurious loss of this kind is to borrow a large amount of money, buy something which immediately generates large paper losses, and avoid paying back the loan. That can be accomplished by inflated price and nonrecourse financing. Nonrecourse financing is a common indicator of a sham transaction. *See, e.g., Coleman v. Commissioner*, 16 F.3d 821 (7th Cir.1994); *Lukens v. Commissioner*, 945 F.2d 92 (5th Cir.1991); *James v. Commissioner*, 899 F.2d 905 (10th Cir.1990); *Rice's Toyota World, Inc. v. Commissioner*,

752 F.2d 89 (4th Cir.1985). Loans which do not really have to be paid by the taxpayer enable him to pretend to pay an artificially high price and generate a correspondingly high tax credit and depreciation deduction, without the risk of really having to pay for what he has purportedly bought.

*Casebeer* and the case at bar are distinguished by the nonrecourse financing used in *Casebeer*. In *Casebeer*, nonrecourse notes were a significant part of the transaction, *Casebeer*, 909 F.2d at 1361. *Cf. Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir.1985) (a sale-leaseback set up by the same computer leasing company as in *Casebeer* was a sham largely because five-sixths of the purchase price was financed by nonrecourse loans).

In contrast, Mr. Sacks signed ordinary, negotiable notes personally obligating him for the entire price. The Tax Court, however, found that Mr. Sacks' notes to BFS Solar were "just so much window dressing," not genuine recourse obligations. *Sacks*, 64 T.C.M. (CCH) at 1027. The Tax Court found that the notes were "recourse in form." It held that they were not genuine obligations because (1) BFS Solar was "an essential party to the sale-leaseback arrangement," instead of an independent third party creditor; (2) Sacks' payments on the notes would be covered by the homeowners' anticipated rental payments for the solar water heaters; (3) Sacks did not police the placement of his water heaters and did not know where they were; (4) nothing in the record "persuades the Court that Trobman or BFS Solar intended to enforce the notes, or that petitioner believed they would ever attempt to do so."

The Tax Court's findings that the notes are recourse in form, that they were expected to be paid out of homeowners' rents, that they were owed to the seller in the sale-leaseback rather than an independent third party, and that Mr. Sacks did not check on placement of his units, are all supported by the record.

■ The Tax Court's finding that Mr. Sacks "was not at risk" is clearly erroneous. That the business plan would, if it worked out, generate money from the homeowners to make the payments on the notes, does not make them nonrecourse. Investors typically try to generate revenue from their assets which will cover the carrying charges. That BFS Solar rather than a third party was the promisee might facilitate nonrecourse financing, but does not by itself turn the notes into nonrecourse notes without an agreement by BFS Solar not to collect the amounts due. Likewise, Mr. Sacks's lack of interest in watching his water tanks go on rooftops would be consistent with an expectation that he was never going to have to pay for the water tanks, but has little force in proving it in this case. The tanks were worth little to him without Mr. Trobman's promotional efforts, unless he chose to cut down his law practice to go into the solar heating business, and the amount at risk was not so large as to persuade a successful lawyer to sacrifice billable hours in order to keep an eye on his water tanks.

■ The most persuasive evidence that Mr. Sacks expected to pay the amounts in the notes is that they were personally obligatory, negotiable, and in amounts small enough so that Mr. Sacks was likely to be able to pay them. If a person with an income of $100,000 a year and assets of $500,000 were to sign a $10 million note, it would be his creditor's problem, or more likely, would be intended not to be paid. But if a successful lawyer signs negotiable notes for $36,000, they are his problem, and it is hard to see how he can expect not to pay them.

Mr. Sacks was asked in the Tax Court proceeding "Did you have any side agreement with Mr. Trobman that there would be circumstances under which you wouldn't pay those notes." He testified, "Absolutely not." There is no basis in the record for inferring any sort of "gentleman's agreement" not to collect the money due on the notes. Even if Mr. Trobman preferred continued friendship with Mr. Sacks to collecting the money and thought collecting what he was owed would damage his friendship, Mr. Trobman could negotiate the notes to a third party, or BFS Solar's creditors could take them against Mr. Trobman's will by garnishment or in a bankruptcy.

Because it was financed with full recourse notes, Sacks' purchase and lease of solar heaters is more like the transaction in *Frank Lyon* than *Casebeer*. In *Frank Lyon,* the investor expected never to pay anything out of his pocket on the notes; nevertheless, he was personally obligated for the entire amount, and thus at risk for that amount. 435 U.S. at 577, 98 S.Ct. at 1300. In the case at bar, as in *Pritchett v. Commissioner,* 827 F.2d 644 (9th Cir.1987), even though the debt was intended to be paid with revenues from the investment, the taxpayer owed the money regardless of whether the business plan succeeded, and could not avoid personal responsibility for the debt. *Id.* at 647. As in *Pritchett,* the taxpayer, Mr. Sacks, was "at risk" for purposes of 26 U.S.C. § 465.

2. *The Price.*

Another hallmark of a sham is grossly inflated price. The combination of an inflated price and nonrecourse financing enables a purported investor to shuffle paper in order to create tax deductions and credits, without actually paying the purported price to anybody. The price here, however, was not grossly inflated. Grossly inflated price may be evidence that the price is not really intended to be paid.

As was explained above, the Tax Court found that the $4,800 price "was about the middle of the range of prices for other solar water heaters that were being sold directly to homeowners at retail prices at that time." *Sacks,* 64 T.C.M. (CCH) at 1008. The Tax Court went on to discuss how, using various valuation methods, the government's expert arrived at different estimates of fair value. Assuming someone who purchased five units could get the wholesale price, the government's expert suggested that the solar water heaters may be worth about $1,110; *id.* at 1018. The value of the component parts summed up to $814, *id.* at 1019; the present value of the homeowner's expected savings was estimated at $3,166, *id.;* and, assuming the rental price would reflect 75% of a homeowner's energy savings, an 8.2% increase in energy rates, a 15 year useful life, and a discount rate of 20%, the investor's future income stream was given a present value of $1,152. *Id.* at 1020.

■ The government's valuation analysis would be useful in determining whether the price was inflated if the interest sold and leased back could not readily be compared to a market price to determine if it was grossly inflated. *See Citizens and Southern Corporation v. Commissioner,* 91 T.C. 463, 498, 1988 WL 90987 (1988) (discounting future income is one of several techniques for valuing an asset). For many interests sold in tax shelter deals, there is no market for comparables, so it is impossible to estimate their fair market value except by discounting to present value an anticipated future stream of income, or using some other indirect method of inferring fair market value. In this case, though, once the Tax Court found that Mr. Sacks paid approximately the "middle of the range of prices for other solar water heaters that were being sold directly to homeowners at retail prices at that time," *Sacks,* 64 T.C.M. (CCH) at 1008, the grossly inflated price inquiry was completed. Though arguably he might get a better price for ten, or five units than a homeowner would get for one, the number was not so great as to make that inference highly probable, and any investor would expect to pay the promoter something for arranging the transaction and shopping for the hardware.

3. *Investment Analysis.*

The Tax Court went through a cash flow analysis to show that Mr. Sacks would be unlikely to make money from his solar water heaters, but for the tax benefits. *Id.* at 1023–27. It assumed for this analysis that the useful life of the solar water heaters was ten years, with no salvage value at the end of that time, that energy costs would increase at 2% over an anticipated 6.2% inflation rate, that homeowners would save 60% on their annual electric bills and pay rent in an amount equal to 75% of their savings, and that future income should be discounted to present value at 17%. *Id.* at 1023–26. Comparing the income stream it estimated using these assumptions to Mr. Sacks' investment, it determined that the anticipated income from investment was negative, before federal taxes. *Id.* at 1026. "Neither [the 1982 nor the 1983] transaction made economic sense

without first taking into account Federal Tax benefits." *Id.*

This analysis does not suffice to establish that the sale-leaseback was a sham. The Tax Court's determinations regarding useful life, salvage value and discount rate do not appear to be supported by the record, so if it were necessary, we would probably conclude, as Mr. Sacks urges, that these findings are clearly erroneous. Even if a prudent and conservative individual would not agree with Congress and the Arizona Solar Energy Commission regarding the likely rate of increase of energy prices, Mr. Sacks's optimism, from an energy seller's viewpoint, was not so great as to cast doubt on his profit motive. There is no particular reason to think that this largely passive water tank and sun receptor, warranted by the manufacturer for ten years, would be worthless after ten years. Nor is the investor bound to discount the future at the rate the Commissioner thinks prudent. *See Hilton v. Commissioner,* 671 F.2d 316 (9th Cir.1982).

In this particular sale-leaseback transaction, however, even if these findings of fact were correct, we would still reject the sham determination. We therefore need not reach a conclusion regarding whether the fact findings are clearly erroneous.

■ Mr. Sacks' investment did not become a sham just because its profitability was based on after-tax instead of pre-tax projections. It is undisputed that he stood to make money on an after-tax basis. "The fact that favorable tax consequences were taken into account ... is no reason for disallowing those consequences." *Frank Lyon,* 435 U.S. at 580, 98 S.Ct. at 1302. Where a transaction has economic substance, it does not become a sham merely because it is likely to be unprofitable on a pre-tax basis. If in a sale-leaseback, the purchaser retains significant risks and benefits of ownership and is "the one whose capital was committed" based on cash or negotiable full recourse promissory notes, then the possible imprudence of his investment does not disqualify him from taking the depreciation deductions and tax credits. *Id.* at 572, 581, 98 S.Ct. at 1298, 1302. This is true even though the investor paid more "because [the investor] anticipated the bene-

fit of the depreciation deductions." *Id.* at 580, 98 S.Ct. at 1302.

Mr. Sacks participates more fully in the attributes of ownership than the taxpayer in *Frank Lyon.* Mr. Sacks, unlike Mr. Lyon's company, owns the potential for upside gain on the water heaters. In *Frank Lyon,* the bank had the contractual right to buy out the investor for what the investor had in the deal plus a 6% return on the down payment. 435 U.S. at 567, 98 S.Ct. at 1294. If the value of the building went up, the bank could exercise its option and reap all of that gain. In contrast, Mr. Sacks owns the solar water heaters, whether they turn out to be duds or bonanzas. If energy prices rise faster than the price of solar water heaters fall, Mr. Sacks stands to make more money. After 53 months, when the units are still well within Amcor's warranty period and their useful life by any measure, Mr. Sacks owns them free and clear and can negotiate whatever deal the market will bear. If energy prices were to fall substantially, Mr. Sacks would be stuck with writing checks to cover his notes, and doing something with all the economically useless hardware.

■ Absence of pre-tax profitability does not show "whether the transaction had economic substance beyond the creation of tax benefits," *Casebeer,* 909 F.2d at 1365, where Congress has purposely used tax incentives to change investors' conduct. Congress and the Arizona legislature purposely skewed the neutrality of the tax system, even more than the usual tax credits and accelerated depreciation designed to encourage more investment in capital goods than would otherwise be made, because they sought to induce people to invest in solar energy. The House Committee on Ways and Means stated:

> the committee recognizes that solar and wind energy equipment technology is presently at an early stage of commercialization. In view of this, the committee feels that there is a need to encourage the purchase and installation of this equipment. Thus, the committee decided to provide a credit for a limited number of years in order to accelerate the purchase and installation of this equipment and the devel-

opment of solar and wind energy technology.

H.R.Rep. No. 496(III), 95th Cong., 1st Sess. 1977, 1978 U.S.C.C.A.N. pp. 8173, 8304, 8335–36. The larger the tax advantage of a particular kind of investment, the greater the difference between before tax and after tax profitability is likely to be.

If the government treats tax-advantaged transactions as shams unless they make economic sense on a pre-tax basis, then it takes away with the executive hand what it gives with the legislative. A tax advantage such as Congress awarded for alternative energy investments is intended to induce investments which otherwise would not have been made. Congress sought, in the 1977 energy package, of which the solar tax credits were a part, to increase the use of solar energy in U.S. homes and businesses. H.R.Rep. No. 95–543, 95th Cong. 1st Sess., 1978 U.S.C.C.A.N. 7673, 7678 (stating that among the goals of the National Energy Act is that there be solar energy in more than 2½ million homes by 1985).

If the Commissioner were permitted to deny tax benefits when the investments would not have been made but for the tax advantages, then only those investments would be made which would have been made without the Congressional decision to favor them. The tax credits were intended to generate investments in alternative energy technologies that would not otherwise be made because of their low profitability. *See* H.R.Rep. No. 496 at 8304. Yet the Commissioner in this case at bar proposes to use the reason Congress created the tax benefits as a ground for denying them. That violates the principle that statutes ought to be construed in light of their purpose. *Cabell v. Markham,* 148 F.2d 737 (2d Cir.1945) (L. Hand, J.).

## III. CONCLUSION

The sale-leaseback in this case was not a sham. We reverse, and remand for entry of a judgment to that effect. It necessarily follows from our findings and conclusion that the Tax Court erred in imposing an overvaluation penalty pursuant to 26 U.S.C. § 6659.[1] Likewise, the negligence penalty imposed pursuant to 26 U.S.C. § 6653(a) must necessarily be vacated.

REVERSED and REMANDED.

---

1. 26 U.S.C. § 6659 has been recodified as § 6662.