**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN PAUL REDDAM, *Petitioner-Appellant*, | No. 12-72135 |
| v. | Tax Ct. No. 22557-08 |
| COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellee*. | OPINION |

Appeal from a Decision of the United States Tax Court

Argued and Submitted
April 10, 2014—Pasadena, California

Filed June 13, 2014

Before: Jerome Farris and Andrew D. Hurwitz, Circuit Judges, and Paul L. Friedman, District Judge.[*]

Opinion by Judge Hurwitz

---

[*] The Honorable Paul L. Friedman, District Judge for the U.S. District Court for the District of Columbia, sitting by designation.

**SUMMARY****

**Tax**

The panel affirmed the Tax Court's decision affirming a decision by the Commissioner of Internal Revenue disallowing a capital loss deduction because it lacked economic substance and was intended to create capital losses.

Taxpayer pursued a tax and investment program marketed by KPMG, the Offshore Portfolio Investment Strategy (OPIS), to reduce the tax liability associated with either taking his company public or selling it. Applying the economic substance doctrine, the panel held that the record supported the Tax Court's conclusion that taxpayer pursued the OPIS product solely for its tax benefits, as well as the conclusion that the product had no practical economic effects other than the creation of income tax losses.

**COUNSEL**

David W. Wiechert (argued) and Jessica C. Munk, Law Office of David W. Wiechert, San Clemente, California, for Petitioner-Appellant.

Kathryn Keneally, Assistant Attorney General, Tamara W. Ashford, Deputy Assistant Attorney General, Gilbert S. Rothenberg, Richard Farber, and Judith A. Hagley (argued),

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Attorneys, Tax Division, Department of Justice, Washington, D.C., for Respondent-Appellee.

## OPINION

HURWITZ, Circuit Judge:

John Paul Reddam claimed a deduction on his 1999 tax return of $50,164,421 for a capital loss purportedly generated by several Cayman Islands entities. The Commissioner of Internal Revenue disallowed the deduction, finding that the transaction lacked economic substance. After a bench trial, the Tax Court affirmed. *Reddam v. Comm'r*, No. 22557-08, 2012 WL 1215220 (T.C. Apr. 11, 2012). We have jurisdiction over Reddam's appeal under 26 U.S.C. § 7482(a)(1) and affirm.

## I. Factual Background

### A. Reddam's $48,500,000 capital tax gain and search for tax reduction strategies

In 1995, Reddam founded several companies (collectively "DiTech") that originated, purchased, and serviced residential home loans. Reddam was the sole shareholder, chief executive officer, and chairman of the board of each entity. Between 1995 and 1997, DiTech grew significantly.

Reddam used KPMG[1] for his personal taxes and DiTech's corporate returns. KPMG also served as DiTech's auditor.

---

[1] The firm was named KPMG Peat Marwick until 1999.

In 1998, Reddam hired a KPMG partner, Scott Carnahan, as the president of DiTech.

In 1998, Reddam considered either taking DiTech public or selling it; he also investigated ways to reduce the tax liability associated with those strategies. Carnahan therefore introduced Reddam to a KPMG tax partner, Carl Hastings. Hastings recommended that Reddam pursue a tax and investment program marketed by KPMG: the Offshore Portfolio Investment Strategy ("OPIS").

According to KPMG's marketing materials, OPIS utilized "100% leverage offshore" to allow investors "to avoid U.S. regulatory rules that limit the amount of financing permissible in securities transactions." The materials stated that the strategy "[m]aximizes U.S. investor's basis in foreign bank stock and thereby minimizes gain, or maximizes loss, on the disposition of such stock," something that would only be desirable to a U.S. investor with other significant gains to offset.[2] KPMG emphasized that the costs of investing in OPIS were not based on potential investment gains, but were instead tied to the amount of "capital gain [tax] exposure" to be eliminated.

After several meetings with KPMG tax partners, Reddam understood OPIS to be a "complicated, technical" investment strategy that involved "some kind of basis shift," whose "details were all very, very complicated." He understood that OPIS employed "hedging," so that any potential upside relied

---

[2] The tax code defines the basis of property as "the cost of such property." 26 U.S.C. § 1012(a). As a general matter, the greater the basis a taxpayer has in an asset, the lower the gain on the disposition of that asset and, hence, the lower the taxes owed.

entirely on a rise in an underlying foreign bank stock. However, in general, Reddam did not "understand how [OPIS] works."

Reddam knew that OPIS might "make money," but chiefly was drawn to its potential "to be successful relative to generating a tax loss." He sought the advice of KPMG tax partners because he was "looking to make sure that I paid the lowest tax rate that I could."

Before investing, Reddam had Carnahan contact KPMG's competitors to inquire if they were offering similar "tax elimination" products. He was informed that several were, but Ernst & Young was not, because it did not think such a product "worked." Carnahan advised Reddam to seek independent advice because he was "a little concerned that the same people pitching the transaction and receiving a fee for that transaction would also be giving the [tax] opinion on that transaction." Nonetheless, Reddam never sought independent investment or legal advice.

In April 1999, GMAC Mortgage Corporation purchased DiTech, making an initial payment of $70,000,000. Reddam incurred a $48,500,000 capital tax gain and decided to "enter the OPIS transaction."

In early May 1999, Reddam hired KPMG as his "tax advisor" with respect to OPIS. KPMG again "recommend[ed] that [Reddam] seek independent advice concerning the investment aspects of the proposed transaction." Reddam never did.

## B. Simplified overview of Reddam's OPIS transaction

The Tax Court opinion thoroughly explains the byzantine OPIS transaction.[3]  *Reddam*, 2012 WL 1215220, at *3–12.

---

[3] A professor at the University of Texas at Austin who has testified on behalf of plaintiffs seeking recovery of costs from KPMG explains OPIS transactions this way:

> The FLIP/OPIS shelter depends technically on the cost basis of a Cayman Islands entity shifting over to a related U.S. taxpayer after the Cayman Islands entity was redeemed out.  For each purchaser, a shell Cayman Islands corporation or partnership was set up that was related, within the constructive ownership rules of [26 U.S.C.] section 318, to the U.S. taxpayer who purchased the shelter.  The Cayman Islands entity bought stock of a foreign bank, either Deutsche Bank or UBS, with funds borrowed on a nonrecourse basis from the same bank, in the amount of the artificial loss to be generated.  A few weeks later, the same bank redeemed all the stock, and the Cayman Islands entity repaid the bank with the redemption proceeds.  The redemption, however, purported to fail to qualify as a redemption under U.S. tax law.  [*See* 26 U.S.C. § 302(b)(1).]  A shareholder giving up shares in a failed redemption has a dividend rather than a sale or exchange and cannot use its basis in the redeemed shares against the redemption proceeds.  [*See id.*]  FLIP/OPIS rests on the claim that the basis of the Cayman Islands entity that could not be used in the redemption transferred over to bank stock owned by the related U.S. taxpayer who had purchased the shelter.  [*See id.* § 302(c); 26 C.F.R. § 1.302-2(c).]  The U.S. taxpayer thus purportedly had an excess, built-in loss on his bank stock by the amount

Given the transaction's complexity, we detail only those aspects necessary to explain our holding, and append KPMG's graphical description of an OPIS transaction to this opinion.[4]

of the original borrowed cost basis of the Cayman Islands entity. The U.S. taxpayer reported the excess loss on the sale of his bank stock.

Calvin H. Johnson, *Tales from the KPMG Skunk Works: The Basis-Shift or Defective-Redemption Shelter*, 108 Tax Notes 431, 434 (July 25, 2005). The parties' joint stipulation of facts explains the steps in OPIS as follows:

KPMG's OPIS generally involved the following structured transactions: (i) KPMG client's purchase of foreign bank's stock; (ii) KPMG client's agreement to a "swap" transaction with a foreign owned limited liability company that owned partnership interests in an off-shore partnership; (iii) KPMG client's purchase of a call option to acquire a fifty percent interest in the general partner of the off-shore partnership; (iv) off-shore partnership's purchase of stock in foreign bank using proceeds from a loan from that bank; (v) offshore partnership's purchase of options from foreign bank; (vi) foreign bank's purchase of options from off-shore partnership; (vii) foreign bank's redemption of the stock acquired by offshore partnership; and (viii) client's purchase of an option to acquire foreign bank's stock in an amount equal to the foreign bank stock redeemed.

[4] KPMG planned OPIS transactions to be carried out in a specific sequence. Although Reddam's transactions did not occur in the precise order envisioned by KPMG, the Commissioner does not argue that this altered the Internal Revenue Code's treatment of Reddam's transaction vis-a-vis a "properly" enacted OPIS transaction.

First, Reddam[5] entered into an Investment Advisory Agreement with Presidio, a firm owned and operated by former KPMG partners. Several entities were then created: (i) a domestic limited liability company owned by a foreign person (that therefore owed no U.S. taxes, *see* 26 U.S.C. §§ 881–85), Clara Street, LLC; (ii) a Cayman Islands corporation, Clara Street Ltd. (owned by Clara Street, LLC); and (iii) a Cayman Islands limited partnership, Cormorant LP ("Cormorant"), whose limited partner was Clara Street LLC and general partner was Clara Street Ltd. Presidio also created investment accounts at Deutsche Bank for Reddam and the entities.

Second, Reddam deposited $6,000,000[6] into his Deutsche Bank account, of which $2,500,000 was used to purchase Deutsche Bank common stock. The remaining funds were used to (a) enter into a "rate swap transaction" under which Reddam made two fixed rate payments to Clara Street LLC in exchange for the LLC's agreement to make payments to Reddam based on the average price of Deutsche Bank stock during the timeframe of the OPIS transaction (May to July 1999), and (b) buy a call option (the "first call option") from Clara Street LLC for $150,000 that permitted Reddam to either (i) purchase fifty percent of Clara Street Ltd., or (ii) receive the value of Clara Street Ltd. in cash.

---

[5] On KPMG's advice, Reddam formed the J. Paul Reddam Trust to implement the OPIS transaction. Because a grantor trust is disregarded as an entity for income tax purposes, *see* 26 U.S.C. § 671, we refer to Reddam and the trust collectively as "Reddam."

[6] Much of the transaction was carried out in euros. To minimize complexity, we describe the transaction in approximate U.S. dollar amounts.

Third, Cormorant borrowed approximately $42,000,000 from Deutsche Bank to purchase Bank stock. The stock was pledged as collateral for the loan, and Deutsche Bank retained significant control over the stock. Deutsche Bank was also given a security interest in Clara Street LLC and Clara Street Ltd., the companies that owned Cormorant.

Fourth, Cormorant and Deutsche Bank engaged in several options transactions. Cormorant purchased options exercisable from May to July 1999 that had strike prices within a narrow range, most of which were tied to the price of Deutsche Bank stock during that time period.[7] The options permitted Deutsche Bank to purchase a portion of the Bank stock owned by Cormorant if the price was within a certain narrow range during May to July 1999.

Fifth, Cormorant sold all the Deutsche Bank stock it held back to the Bank, using the proceeds to pay off the loan originally used to purchase the shares. Although the value of Deutsche Bank stock had risen in the interim, Cormorant made virtually no profit because the purchase agreement required Cormorant to sell ninety percent of the stock at a price below its purchase price.

Sixth, Reddam purchased call options from Deutsche Bank that permitted him to purchase Deutsche Bank stock in July or August, 1999 (the "back end options").

Seventh, Reddam exercised the first call option, opting to have Clara Street LLC pay him a cash settlement, rather than sell him the shares in Clara Street Ltd.

---

[7] Cormorant bought a put option, European-style Asian call options, and European-style fade-in options.

Eighth, Reddam sold his back end call options to Deutsche Bank for a profit of approximately $200,000.

Finally, Reddam sold the $2,500,000 of Deutsche Bank stock he purchased directly for approximately $2,900,000.

### C. Simplified overview of Reddam's calculation of basis in underlying securities from OPIS transaction

The purported tax benefits of OPIS hinge on transferring basis from an off-shore entity to a U.S. taxpayer. Consequently, we set forth Reddam's position on how his bases in the securities underlying his OPIS transaction should have been calculated.

Reddam paid approximately $2,500,000 for shares in Deutsche Bank. Cormorant purchased approximately $42,000,000 of Deutsche Bank stock, using the proceeds of the loan it obtained from Deutsche Bank. Cormorant and Reddam were related parties. *See* 26 U.S.C. § 318. Reddam therefore took the position that, for tax purposes, he constructively owned Cormorant's Deutsche Bank stock. *See* § 318(a)(2)(A), (a)(2)(C), (a)(4), (a)(5). Similarly, Reddam took the position that Cormorant constructively owned the $2,500,000 worth of shares that he purchased directly. Thus, on his 1999 tax returns, Reddam calculated his total basis in the Deutsche Bank stock, including the purchase prices and the various brokerage fees, as approximately $43,800,000.

When Cormorant sold its shares in Deutsche Bank back to the Bank for $42,000,000, Cormorant ordinarily would be treated as having been completely redeemed under 26 U.S.C. § 302(b)(3). But, Reddam took the position that because

Cormorant also constructively owned Reddam's $2,500,000 worth of Deutsche Bank shares, Cormorant's sale was neither a complete redemption under § 302(b)(3), nor a substantially disproportionate redemption under § 302(b)(2). Rather, Reddam contended that after the sale, there was no "meaningful reduction" in Cormorant's ownership of Deutsche Bank. *United States v. Davis*, 397 U.S. 301, 313 (1970) ("[T]o qualify for preferred treatment under [§ 302(b)(1)], a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation."). Reddam took the position that Cormorant's sale of the $42,000,000 of stock to Deutsche Bank was actually a dividend Cormorant was required to include in gross income under 26 U.S.C. § 301(c)(1); as a result, Cormorant now had $42,000,000 in basis it could not use to offset its gain from the sale of that stock.[8] Applying the constructive ownership rules of § 318, Reddam treated Cormorant's unused basis as available to him. *See* § 302(a); 26 C.F.R. § 1.302-2(c). Hence, after fees and divisions between the various entities, Reddam claimed a basis of $43,800,000 in his Deutsche Bank shares, despite having directly purchased only $2,500,000 worth of shares.

Using essentially the same analysis, Reddam contended that his bases in (1) the first call option, (2) the rate swap transaction, and (3) the back-end call options were, respectively, $9,400,000, $3,650,000, and $164,000.

---

[8] Because Cormorant was a Cayman Islands partnership, it was indifferent to the U.S. tax consequences of this treatment. *See* 26 U.S.C. §§ 881–85.

### D. Reddam's reported gains and losses on his 1999 tax returns

On his 1999 returns, Reddam reported $48,500,000 of capital gains from his sale of DiTech, and an offsetting loss of $50,200,000 from the OPIS transaction. The $50,200,000 loss was based on the following calculations:

|  | Sale Price | Cost Basis | Gain/Loss |
| --- | --- | --- | --- |
| Deutsche Bank Stock | $2,900,000 | $43,800,000 | -$40,900,000 |
| First Call Option | $800,000 | $9,400,000 | -$8,600,000 |
| Swap Transaction | $3,000,000 | $3,650,000 | -$650,000 |
| Back-end Call Options | $98,000 | $164,000 | -$66,000 |
| Total | $6,800,000 | $57,000,000 | -$50,200,000 |

## II. Procedural Background

In 2001, the IRS announced it would not recognize alleged tax benefits attributable to OPIS transactions. I.R.S. Notice 2001-45, 2001-2 C.B. 129. In 2003, the IRS offered a settlement under which OPIS "participants would give up 80 percent of their tax losses and would still face appropriate penalties." Johnson, *supra*, at 434. The IRS later "announced that 92 percent of the taxpayers it identified as buying the shelter have taken the IRS settlement offer." *Id*.

Reddam did not accept the offer. The Commissioner disallowed all of Reddam's claimed capital losses from the OPIS transaction and determined a deficiency of $8,000,000

on his 1999 returns. Reddam timely challenged the deficiency in the Tax Court, which conducted a bench trial.

In the Tax Court, the Commissioner urged five different grounds in support of the deficiency determination. *Reddam*, 2012 WL 1215220, at \*15 & n.12. The court, however, upheld the deficiency on a single ground, finding that the OPIS transaction "lacked economic substance." *Id.* at \*15–20.

As the Tax Court correctly noted, the

> economic substance doctrine is a judicial mechanism which allows a court to disregard a transaction for Federal income tax purposes if it finds that the taxpayer did not enter into the transaction for a valid business purpose but rather sought to claim tax benefits not contemplated by a reasonable application of the language and purpose of the Code or the regulations.

*Id.* at \*15. And the Tax Court also recognized, in determining whether a transaction lacks economic substance, that the Ninth Circuit generally applies a two-pronged inquiry addressing the objective nature of the transaction (whether it has economic substance beyond tax benefits) and the subjective motivation of the taxpayer (whether the taxpayer had a non-tax business purpose for the transaction). *Id.* at \*16–17 (citing *Bail Bonds by Marvin Nelson, Inc. v. Comm'r*, 820 F.2d 1543, 1549 (9th Cir. 1987)). The Tax Court also recognized, however, that we have "rejected the notion" that this is a "'rigid two-step analysis,'" but rather a single inquiry into "whether the transaction had 'any practical economic

effects' other than tax benefits." *Id.* at \*17 (quoting *Sacks v. Comm'r*, 69 F.3d 982, 988 (9th Cir. 1995)).

## A.  Subjective inquiry

The Tax Court appropriately framed the inquiry as "whether the taxpayer was induced to commit capital for reasons relating only to tax considerations or whether a nontax or legitimate profit motive was involved." *Id.* at \*19 (citing *Shriver v. Comm'r*, 899 F.2d 724, 726 (8th Cir. 1990)).

After considering the evidence, the court concluded that Reddam's "overriding purpose" was tax avoidance. *Id.* Reddam became interested in OPIS only after learning it would "eliminate" his gain from the sale of DiTech, and the court held that the "economic reality of [the] investment" belied any profit motive. *Id.* Reddam's lack of understanding of the OPIS transaction, coupled with his "lack of due diligence" and reliance on opinion letters only from marketers of the deal also indicated that "he knew he was purchasing a tax loss rather than entering into a legitimate investment." *Id.* at \*20. The Tax Court could not "excuse his willful indifference as to the profit potential of the transaction and accept that his uninformed position was sufficient to satisfy [the] business purpose inquiry." *Id.* Rather, Reddam's "refusal" to "fully investigate the transaction, by . . . hiring outside counsel to analyze the transaction . . . underscore[d] that [he] was entirely unconcerned with the profitability of the investment." *Id.*

## B.  Objective inquiry

The Tax Court acknowledged that a transaction satisfies the economic substance doctrine if it has "'any practical economic effects' other than tax benefits." *Id.* at \*16 (quoting *Sacks*, 69 F.3d at 988).  The court therefore addressed the experts' reports on the OPIS transaction, to determine whether "the transaction was likely to produce benefits aside from tax deductions." *Id.* (citing, inter alia, *Bail Bonds*, 820 F.2d at 1549).  The Commissioner's expert (Dr. Kolbe) calculated the OPIS transactions' net present value ("NPV") and the expected rate of return of each component relative to its individual cost of capital, while Reddam's expert (Dr. Miller) performed an expected rate of return analysis "'functionally equivalent' to the NPV analysis" performed by Dr. Kolbe. *Id.* at \*17.  The Tax Court, however, "ascribe[d] little value" to either of these calculations because they "do little to aid in our determination of whether a profit was reasonably likely in the OPIS transaction." *Id.* (internal quotation marks and citations omitted).

The court did find useful Dr. Kolbe's "additional comparison of the 'values' of the discrete elements of the OPIS transaction to their purchase price" because it "does, partially, illuminate the economics of petitioner's investment." *Id.*  According to Dr. Kolbe, Reddam "overpaid $2,289,650 for the entire OPIS transaction" because, other than his direct purchase of Deutsche Bank stock, "each distinct aspect of the transaction was materially mispriced to [his] disadvantage." *Id.*  Although this mispricing was not "dispositive," the Tax Court noted, it "signals to this Court that the transaction was devoid of economic substance." *Id.*

Reddam's expert, Dr. Miller, claimed that in twenty-three to twenty-five percent of the possible future price paths the OPIS transaction could have taken (based on possible trajectories of the underlying Deutsche Bank stock) a profit net of tax benefits would result. *Id.* at \*18. Dr. Kolbe argued that Dr. Miller used an improper measure of volatility and that these transactions would have resulted in a profit no more than ten to twelve percent of the time. *Id.* Without expressly adopting either analysis, the Tax Court concluded that the pretax profit potential of OPIS was "so remote as to render disingenuous any suggestion that the transaction was economically viable." *Id.*

When the "allegedly purposeful mispricing" of the options and swap agreement were also considered, the court concluded "it is clear that petitioner remained in an economically untenable position with little hope of profit before taking into account the investment's tax benefits." *Id.* The court was "unconvinced that the mere hint of future profitability, be it at 10 or 25% likelihood . . . requires this Court to conclude that the investment was 'likely' to produce benefits aside from substantial capital losses." *Id.* (citing *Bail Bonds*, 820 F.2d at 1549).

The Tax Court also rejected Reddam's argument that, had "the transaction been entered into a few months later, he would have made several million dollars" because Reddam suffered a "significant economic loss of approximately $342,507 on his OPIS transaction." *Id.* Rather, the undisputed facts indicated that "a pretax profit on the investment was highly unlikely" and Reddam's own expert agreed that "on average, and at the median, the transaction generates a substantial loss." *Id.* (internal quotation marks omitted). Thus, the Tax Court found that "the evidence

reveals the OPIS transaction to be clearly lacking in economic substance," *id.*, and held that "accordingly, [it] should be disregarded for tax purposes," *id.* at *20.

## III.   Discussion

### A.  Standard of Review

The Tax Court's factual determinations about a transaction's economic substance are reviewed for clear error, but the legal standards it applies and the application of those standards to the facts are reviewed de novo. *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978); *Sacks*, 69 F.3d at 986. "In addition, the Commissioner's determination that the transaction is a sham is presumptively correct, and Taxpayers have the burden of producing evidence to rebut the deficiency determination and [the] burden of persuasion to substantiate the deduction." *Sochin v. Comm'r*, 843 F.2d 351, 355 n.9 (9th Cir. 1988), *abrogated on other grounds by Landreth v. Comm'r*, 859 F.2d 643, 648–49 (9th Cir.1988); *see also Welch v. Helvering*, 290 U.S. 111, 115 (1933) (stating that Commissioner's determination that expenses were not deductible is a "ruling [that] has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong").

### B.  Economic Substance Doctrine

The economic substance doctrine focuses both "on the subjective aspect of whether the taxpayer intended to do anything other than acquire tax deductions, and the objective aspect of whether the transaction had any economic substance other than creation of tax benefits." *Sacks*, 69 F.3d at 987; *see also Casebeer v. Comm'r*, 909 F.2d 1360, 1365 (9th Cir.

1990) ("The economic substance factor involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction.") (quotation marks and citation omitted). "[T]he consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses." *Sochin*, 843 F.2d at 354.

### 1.  Subjective Inquiry

Reddam argues that the Ninth Circuit requires only that a taxpayer have "a business purpose and not be motivated solely by tax benefits," and that the Tax Court improperly looked only at "whether taxes were the most important purpose." This court, however, has "repeatedly and carefully noted that" the economic substance doctrine is not a "'rigid two-step analysis,'" *Sacks*, 69 F.3d at 988 (quoting *Casebeer*, 909 F.2d at 1363), but instead focuses holistically on whether "'the transaction had any *practical* economic effects other than the creation of income tax losses,'" *id.* (emphasis added) (quoting *Sochin*, 843 F.2d at 354).

Reddam argues that the Tax Court failed to properly credit his testimony which acknowledged his tax motivation, but also claimed that he entered into the OPIS transaction hoping to "make money." But, on the record before it, the Tax Court was entitled to find that Reddam's efforts "to reduce his tax liabilities which prefaced the investment evidenc[ed] his true motives for engaging in the transaction." *Reddam*, 2012 WL 1215220, at *19. The timing of the OPIS

transaction provided compelling evidence of Reddam's purpose—to offset the enormous taxable gains accumulated from his sale of DiTech.

Reddam also argues that his "investment diligence" distinguishes his case from another OPIS case relied upon by the Tax Court, *Blum v. Commissioner*, in which the taxpayer conceded that he had "no understanding" of many key aspects of the transaction. No. 2679-06, 2012 WL 129801 (T.C. Jan. 17, 2012), *aff'd*, 737 F.3d 1303 (10th Cir. 2013). But, even if Reddam's due diligence exceeded Blum's, the Tax Court properly noted that Reddam nonetheless ignored both KPMG's and Carnahan's recommendations that he seek independent advice regarding the investment portions of OPIS. The court was therefore entitled to find, as a matter of fact, that Reddam was motivated to invest millions of dollars in OPIS solely because of the anticipated tax benefits of the transaction. Given the complicated structure of the OPIS transaction, Reddam's failure to investigate the scheme (which he paid KPMG hundreds of thousands of dollars to implement), belies a profit-making motive.

The KPMG marketing materials also undercut Reddam's argument that he entered into the OPIS transaction for its profit potential. Those materials forthrightly state that the OPIS transaction "minimizes gain, or maximizes loss," an anathema to a profit-seeking investor.[9] The record amply

---

[9] Moreover, in calculating the costs of the OPIS transaction, the KPMG materials list the underlying Deutsche Bank stock and the back-end options as investments, but list the swap transaction and the first call option as out-and-out costs of the transactions, not investments capable of earning a profit.

supports the Tax Court's factual conclusion that Reddam pursued the OPIS product solely for its tax benefits.

## 2.  Objective Inquiry

As noted above, although our cases have analyzed the question of economic substance in two parts, objective and subjective, the fundamental question remains whether the transaction at issue "'had any practical economic effects other than the creation of income tax losses.'" *Sacks*, 69 F.3d at 988 (quoting *Sochin*, 843 F.2d at 354). Put differently, the question is whether a reasonable investor would enter into an OPIS transaction for its possible investment gains. In addressing this question, we look to the "overall structure" of the transaction. *Keane*, 865 F.2d at 1092. Even if a transaction could "as a theoretical matter . . . result in economic gains," it nonetheless lacks substance if it was "executed in such a manner as to insure that the net result . . . would be tax deductible losses." *Id.* at 1091; *see also Gregory v. Helvering*, 293 U.S. 465, 467–70 (1935) (reviewing the "whole undertaking" and affirming Commissioner's disregard of corporate reorganization as being "without substance" because "[t]o hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose").

Reddam argues that, because the Tax Court did not expressly adopt either expert's calculation, it implicitly credited Dr. Miller's conclusion that the OPIS transaction could have generated a profit twenty-three percent of the time, and thus erred as a matter of law in holding that there "was not a reasonable opportunity for profit under the economic substance doctrine." He contends that it "cannot be

said that a 23–25% chance of profit is not meaningful and has no substance whatsoever or is remote."

In response, the Commissioner argues that Reddam's subjective motivation in seeking tax avoidance alone is sufficient to sustain the Tax Court's ruling. The Commissioner also focuses on the fact that the "$50 million tax loss was wholly artificial" and argues that any transaction which creates an artificial tax loss is an economic sham. *See Sala v. United States*, 613 F.3d 1249, 1253 (10th Cir. 2010).

We decline the parties' invitations, however, to apply a one-size-fits-all test. We do not address these issues in isolation; rather, they are part of a pragmatic total inquiry. The application of the economic substance doctrine turns not only on the percentage of possible profit or loss underlying Reddam's OPIS transaction, but also on the likely corresponding magnitude of those possible profits or losses and how would they be reported for tax purposes. *See, e.g.*, *Sacks*, 69 F.3d at 987–88 (holding that a transaction was not a sham because it had a purpose of making money after taxes and shifted risk of non-payment to taxpayer); *Casebeer*, 909 F.2d at 1361 (holding that a transaction was a sham because investors had nothing at risk and nothing to gain except tax benefits); *Sochin*, 843 F.2d at 354 (holding that a transaction was a sham because it had no "practical effects other than the creation of income tax losses"). There was some theoretical possibility that Reddam's OPIS transaction would create a net economic gain. But the magnitude of even the most optimistic gain is dwarfed by the magnitude of the tax loss it was *designed* to generate and the strong probability of a pretax loss.

Put differently, the small percentage chance that Reddam's OPIS transaction could have created a sizeable economic gain in return for his multi-million dollar investment[10] pales in comparison to the expectation that it would *always* create a tax loss of $42,000,000 to $50,000,000. No matter how the underlying Deutsche Bank stock performed, the OPIS transaction was designed inevitably to produce a tax loss: the $42,000,000 shift of basis from Cormorant to Reddam would always (even under Reddam's expert's calculations) have overshadowed any possible gain. On this record, the Tax Court was correct in concluding that the percentage of likely potential gain did not infuse economic substance into what was clearly a tax loss scheme.

Unlike Reddam, we do not read the Tax Court as holding that a transaction with a ten to twenty-five percent chance of generating a profit always lacks economic substance. Instead, we read the Tax Court as properly holding that, in this case, the evidence is overwhelming that no objective investor or taxpayer would enter into the OPIS transaction for its profit making potential. Rather, the overall structure of the OPIS transaction compels the conclusion that it would be purchased solely for its ability to create capital losses. *See Keane*, 865 F.2d at 1091 (affirming the Tax Court's conclusion that

---

[10] Dr. Miller's report states that only in highly uncommon circumstances would the OPIS transaction make any kind of profit, but that five percent of the time it could make between $3,450,000 and $6,300,000. It defies belief that an objective investor would risk $6,000,000 on a transaction that was designed to lose money at least seventy-five percent of the time, could make a nominal profit twenty percent of the time, but might, only five percent of the time, have generated profits in that range for any reason other than to garner the eight-figure tax loss the transaction was designed to generate.

it was the taxpayer's "entire tax straddle scheme . . . which taints the deductibility of the . . . losses") (internal quotation marks omitted).  The Tax Court had ample record support for its factual conclusion that the OPIS transaction has "'no practical economic effects other than the creation of income tax losses.'" *Sacks*, 69 F.3d at 987 (quoting *Sochin*, 843 F.2d at 354).[11]

## IV.    Conclusion

For the reasons above, the judgment of the Tax Court is **AFFIRMED.**

---

[11] Like the Tax Court, we therefore find it unnecessary to reach the Commissioner's other arguments in support of the deficiency determination.

**APPENDIX**



Offshore Portfolio Investment Strategy