

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-16-2002

# In Re: CM Holdings

Precedential or Non-Precedential: Precedential

Docket No. 00-3875

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re: CM Holdings " (2002). *2002 Decisions*. Paper 509.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/509

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 16, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3875

IN RE: CM HOLDINGS, INC.; CAMELOT MUSIC, INC.;
G.M.G. ADVERTISING AND GRAPEVINE RECORDS
AND TAPES, INC.,

Debtors

INTERNAL REVENUE SERVICE

v.

CM HOLDINGS, INC.

CM Holdings, Inc.,
        Appellant

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 97-cv-00695)
District Judge: Honorable Murray M. Schwartz

Argued October 30, 2001

Before: SLOVITER, NYGAARD and AMBRO, Circuit  Judges

(Opinion filed: August 16, 2002)

        Michael I. Saltzman, Esquire
        Lawrence M. Hill, Esquire
        White & Case
        1155 Avenue of the Americas
        New York, NY 10036


        Myron Kirschbaum, Esquire (Argued)
        Howard Kleinhendler, Esquire
        Kaye, Scholer, Fierman, Hays
         & Handler
        425 Park Avenue
        New York, NY 10022

        Pauline K. Morgan, Esquire
        Young, Conaway, Stargatt & Taylor
        P.O. Box 391
        Rodney Square North, 11th Floor
        Wilmington, DE 19899-0391

         Attorneys for Appellant

        Bernard J. Long, Jr., Esquire

J. Michael Hines, Esquire
Paul R. Lang, Esquire
Leslie H. Wiesenfelder, Esquire
Mark E. Liniado, Esquire
Suzanne R. Garment, Esquire
Dow, Lohnes & Albertson
1200 New Hampshire Avenue,
 Suite 800
Washington, D.C. 20036

Jerome B. Libin, Esquire
Sutherland, Asbill & Brennan
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2404

 Attorneys for Amicus Curiae-
Appellant

Claire Fallon
Acting Assistant Attorney General
Robert W. Metzler, Esquire
Richard Farber, Esquire
Dennis M. Donohue, Esquire
 (Argued)
United State Department of Justice
Tax Division
P.O. Box 502
Washington, D.C. 20044

2

Alex E. Sadler, Esquire
United States Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044

James D. Hill, Esquire
Internal Revenue Service
Office of Chief Counsel
312 Elm Street, Suite 2350
Cincinnati, OH 45202

 Attorneys for Appellee

OPINION OF THE COURT

AMBRO, Circuit Judge

Appellant CM Holdings, Inc. ("CM Holdings"), the parent company of Camelot Music, Inc. ("Camelot"), 1 challenges the District Court's holding that loading dividends used to fund insurance premiums for corporate-owned life insurance ("COLI") policies were shams in fact, and that the transactions as a whole lacked economic substance. We affirm, based on the latter reasoning, that the COLI policies lacked economic substance and therefore were economic shams. We also affirm the District Court's assessment of penalties against Camelot for inaccuracies in stating its

income.

I. Background

The District Court excelled in its explication of the facts.
In re CM Holdings, Inc., 254 B.R. 578 (D. Del. 2000). We
review here only the minimum necessary, and begin with
the basics of whole life insurance policies.

Throughout an insured's life, the insurer receives annual
premiums to fund the policy. Most of each premium is

_____

1. Although CM Holdings is the appellant in this case, many of the
relevant decisions were made by Camelot. For the sake of simplicity, we
refer to both entities as "Camelot."

credited to the policy value. However, a percentage, known
as an expense charge, is set aside to cover the projected
costs of administering the policy. Risk-averse as insurers
are, it is unsurprising that often these projected costs
exceed actual expenses by a small amount (known as a
"margin"), which is credited back to the policy value at the
year's end when the actual expenses are known.

The policy value rises in time, not only because
premiums add to the accumulating total each year, but also
because interest accrues on the growing policy value at a
rate specified by the insurer. This value may be used as
collateral for a loan, called a policy loan, borrowed from the
insurer. Even when a policy is fully encumbered, the
insurer still credits interest on its value.

Life insurance policies are tax-favored in two ways. First,
upon death of the insured, the beneficiary receives policy
proceeds free of federal income tax. Second, the gain the
policy value receives from the interest rate credited to it,
known as the "inside build-up," accrues on a tax-deferred
basis.

In the case before us, Camelot purchased life insurance
policies for 1,430 of its employees (known as "COLI VIII"
policies because they were the eighth version of the COLI
plan) underwritten by Mutual Benefit Life Insurance
Company ("MBL"). Camelot designated itself as the
beneficiary of those policies. MBL's COLI business was later
purchased by the Hartford Life Insurance Company
("Hartford"). We will first describe certain features of the
plan, and then the events leading up to Camelot's decision
to buy the policies.

A. The COLI VIII plan

The COLI VIII plan's purpose was to achieve positive cash
flows from its inaugural year. Its success turned on 26
U.S.C. S 264's "4-of-7" safe harbor. This permits life
insurance premiums to be paid with the proceeds of a loan

whose collateral is the policy itself, but only as long as this payment method is used for no more than three of seven consecutive years. To comply with this stricture, in years 1-3 several events happened simultaneously on the first day of the policy year:

4

      (i)  Camelot paid a premium of about $14 million, creating $14 million in policy value;

      (ii)  Camelot took a policy loan of about $13 million, using the policy value created by the premium as collateral;

      (iii) the $13 million loan offset almost fully the $14 million premium payment;

and

      (iv) in net effect, Camelot paid only $1 million cash.

CM Holdings, 254 B.R. at 592-93. The payment of a premium with the proceeds of a loan whose collateral is the premium it pays for is somewhat chimeral, but S 264 permits such a payment mechanism for up to three years, as long as policy loans do not fund the premium payments for the other four years. The result is that in years 1-3, in a simultaneous netting transaction, over 90% of the payment for annual premiums and accrued policy loan interest came from a policy loan, with only the remainder paid in cash.

The payment mechanism for the following four years used a "loading dividend" to fund the premiums. For those years, in a simultaneous netting transaction occurring on the first day of the policy year:

      (i)  Camelot paid the annual premium plus accrued interest;

      (ii)  approximately 95% of the annual premium was taken by MBL as an expense charge, while approximately 5% was credited to the policy value;

      (iii) approximately 5-8% of the expense charge was set aside to cover MBL's actual expenses;

      (iv) approximately 92-95% of the expense charge was immediately returned to Camelot in the form of a "loading dividend";

      (v)  Camelot received a partial withdrawal of policy value in an amount equal to approximately 99% of the accrued loan interest;

5

(vi) the loading dividend and partial withdrawal were
used to offset payment of the annual premium
and accrued loan interest; and

(vii) Camelot paid the balance due in cash.

CM Holdings, 254 B.R. at 593. The broad structure of the
plan, then, was to fund year 1-3 premiums with proceeds
from the policy loans, and year 4-7 premiums with a
loading dividend that offset the payments due.

The interest rate Camelot paid MBL on the loan it
received affected the amount of interest-payment
deductions to which it was entitled. Of several available
interest rates, Camelot always selected the highest one. CM
Holdings, 254 B.R. at 595.[2]

B. Camelot's decision to purchase the COLI VIII plan

The evolution of Camelot's COLI plan began in 1985,
when Henry F. McCamish, a life insurance entrepreneur,
developed a series of COLI policies to produce maximum
cash flow (through interest deductions) for the companies
that bought them. CM Holdings, 254 B.R. at 586. The
original plan evolved over time to reflect changes in the tax
law. In response to a 1986 amendment limiting
deductibility of policy loan interest to $50,000 per insured,
the payment schedule was altered so that payments ceased
once the $50,000 loan limit was reached. Id. at 587. The
plan was further modified to reduce the amount of
premium paid per thousand dollars of death benefits to
comply with 26 I.R.C. S 7702A, also enacted in 1986. Id. at
588. As noted, Camelot purchased the eighth version of the
plan developed, known as the "COLI VIII plan."

The Newport Group, Inc. ("Newport") marketed the COLI
VIII plan to Camelot. Jack Rogers, the CFO of Camelot,
spoke with James Campisi of Newport in detail about it.
Campisi described the COLI VIII plan's "key factor" to be its

_____

2. Theoretically, Camelot also received interest for that portion of the
policy value that was not being used as collateral for a loan. However,
because the policies were projected to have net equity of zero at the end
of each policy year, this "unloaned crediting rate" did not come into play.
Id.

6

ability "to absorb the interest deductions." Id. at 588. In
December 1989, Campisi sent Rogers a set of 40-year sales
illustrations showing projected cash flows and earnings
performance. Id. at 589. In a memorandum, Rogers
enumerated the risks attendant for Camelot: "1) A
retroactive tax law change[,] 2) Camelot's failure to generate
taxable income over several years in a row[, and] 3) IRS
attack." Id. at 590.

Despite these risks, the policies went into effect on

February 16, 1990. Although the policies were designed to be mortality neutral (i.e., neither Camelot nor MBL expected to profit from the timing of employees' deaths), Camelot did receive an unexpected aggregate mortality gain of $1.3 million for the first eight years. CM Holdings , 254 B.R. at 633. However, even with this gain, absent interest deductions the plan would not have been profitable to Camelot. Id. at 634. Hartford (which, as noted, purchased MBL's COLI business) later added surcharges to recoup its mortality losses and ensure that such losses would not recur. Id.

After Congress passed the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, 2090, which phased out interest deductions on COLI loans, "Camelot quickly instructed Hartford to stop billing it for annual premiums and to allow the policies to function as paid-up policies for a reduced amount of death benefit coverage." CM Holdings, 254 B.R. at 640. At the same time, Camelot made a partial withdrawal of policy value, called a "force-out," and used it to pay off $26 million of the loan. Camelot recognized the $26 million as income, but was able to offset it with net operating loss carry forwards. Id. at 641 & n.82.

In August 1996, Camelot filed for Chapter 11 bankruptcy protection in the District of Delaware. The District Court automatically referred the proceeding to the Bankruptcy Court. In November 1997, the Internal Revenue Service ("IRS") filed a proof of claim for $4.4 million in taxes, $1.8 million in pre-petition interest, and a $1.35 million accuracy-related penalty. Camelot objected, creating an adversary proceeding, and the Government requested the District Court to withdraw the automatic reference from the

7

Bankruptcy Court pursuant to 28 U.S.C. S 157(d). The District Court granted the motion. Internal Revenue Serv. v. CM Holdings, Inc., 221 B.R. 715, 724 (D. Del. 1998).

On the merits, the District Court held that the loading dividends for years four through seven were shams in fact, and that the plan as a whole was a sham in substance. It also imposed accuracy-related penalties under 26 U.S.C. S 6662 for Camelot's substantial understatement of taxable income. CM Holdings, 254 B.R. at 654.3

II. Discussion

The relevant Internal Revenue Code provisions are relatively simple. Section 163(a) of the Code allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. S 163(a). However, S 264 provides that

> [n]o deduction shall be allowed for . . . (3) . . . any
> amount paid or accrued on indebtedness incurred or
> continued to purchase or carry a life insurance . . .

contract . . . pursuant to a plan of purchase which
contemplates the systematic direct or indirect
borrowing of part or all of the increases in the cash
value of such contract.

Section 264(d) provides a safe harbor, however,"if no part
of 4 of the annual premiums due during the 7-year period
. . . is paid under such plan by means of indebtedness." 26
U.S.C. S 264(d). In other words, although the IRS generally
allows deductions for interest payments on loans, if the
loan in question is being used to pay the premiums for a
life insurance contract whose cash value is itself the
collateral for the loan, a deduction is allowable only if this
mechanism is used to pay premiums for three years or
fewer out of seven.

_____

3. The District Court had jurisdiction pursuant to 28 U.S.C. SS 157(d)
and 1334. This Court has jurisdiction pursuant to 28 U.S.C. S 1291. We
exercise plenary review over the legal findings of the District Court,
including its interpretation of 26 U.S.C. S 264. ACM Partnership v.
Commissioner, 157 F.3d 231, 245 (3d Cir. 1998).

8

We can forgo examining the intersection of these
statutory details, for pursuant to Gregory v. Helvering, 293
U.S. 465 (1935), and Knetsch v. United States , 364 U.S.
361 (1960), courts have looked beyond taxpayers' formal
compliance with the Code and analyzed the fundamental
substance of transactions. Economic substance is a
prerequisite to the application of any Code provision
allowing deductions. Lerman v. Commissioner, 939 F.2d 44,
52 (3d Cir. 1991). It is the Government's trump card; even
if a transaction complies precisely with all requirements for
obtaining a deduction, if it lacks economic substance it
"simply is not recognized for federal taxation purposes, for
better or for worse." ACM Partnership v. Commissioner, 157
F.3d 231, 261 (3d Cir. 1998) (Lerman 939 F.2d at 45). The
rationale behind the Gregory and Knetsch  line of cases is
that courts should not elevate form over substance by
rewarding taxpayers who have engaged in transactions that
lack any purpose save that of tax savings. The taxpayer has
the burden of showing that the form of the transaction
accurately reflects its substance, and the deductions are
permissible. National Starch and Chemical Corp. v.
Commissioner, 918 F.2d 426, 429 (3d Cir. 1990).

A. Economic Substance

We analyze two aspects of a transaction to determine if it
has economic substance: its objective economic substance
and the subjective business motivation behind it. ACM
Partnership, 157 F.3d at 247. "However, these distinct
aspects of the economic sham inquiry do not constitute
discrete prongs of a 'rigid two-step analysis,' but rather
represent related factors both of which inform the analysis
of whether the transaction had sufficient substance, apart
from its tax consequences, to be respected for tax

purposes." ACM Partnership, 157 F.3d at 247 (citations omitted). Although our Court has hinted that the objective analysis may be more important than the subjective, the latter analysis remains important. See ACM Partnership, 157 F.3d at 248 n.31 ("[W]here a transaction objectively affects the taxpayer's net economic position, legal relations,

or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations.").4

Camelot's COLI plan lacked economic substance. It fails the objective prong because, outside of tax considerations, the transaction had no net economic effect on Camelot's financial position. It fails the subjective prong because at the time the plan was under consideration and agreed on, all parties focused solely on the tax benefits the plan provided. Ultimately the most damning piece of evidence against Camelot is that the marketing information presented to its executives showed that, absent tax deductions, the plan would lose money. Camelot agreed to the plan knowing the tax deductions were the only thing that made it worthwhile.

1. Objective Economic Substance

There are several different formulations of the objective portion of the economic substance inquiry. Knetsch voided a transaction because it "did not appreciably affect [the taxpayer's] beneficial interest except to reduce his tax." 364 U.S. at 366 (internal citations omitted). In United States v. Wexler we held that "[w]here a transaction has no substance other than to create deductions, the transaction is disregarded for tax purposes." 31 F.3d 117, 122 (3d Cir. 1994). In ACM Partnership we required a "net economic effect on the taxpayer's economic position." 157 F.3d at 249. The main question these different formulations address is a simple one: absent the tax benefits, whether the transaction affected the taxpayer's financial position in any way.

We examine the COLI VIII plan's pre-interest deduction profitability just as the District Court did. The plan was never pre-tax profitable. As the District Court pointed out, without interest deductions the 20-year cash flow illustrations Camelot reviewed showed a loss of over $19 million. CM Holdings, 254 B.R. at 625.

---

4. This subjective inquiry appears to be an heir to the "business purpose" requirement applied in early cases. See Gregory, 293 U.S. at 267. Whether it is a direct descendent, it does play the same basic role of evaluating whether the taxpayer had a business reason, aside from tax avoidance, for engaging in the transaction.

The main nontax benefits insurance plans generally offer are mortality gains to the beneficiary, who does not pay tax on proceeds, and interest-free inside build-up. These benefits did not make the Camelot COLI plan pre-tax profitable, however. Even in the anomalous period where Camelot received $1.3 million in benefits, the plan was profitable only if deductions on interest are factored in. CM Holdings, 254 B.R. at 633-34. To correct for the"problem" of the unforeseen mortality gains during this period, Hartford assessed Camelot surcharges since 1995 to recoup its losses and ensure mortality neutrality going forward. Id. at 634.

Similarly, the COLI VIII plan did not use the second potential benefit of insurance contracts. No tax-deferred inside build-up was possible because each month the policies had zero net equity.[5]Id. at 631-32.

Camelot attempts to characterize both Supreme Court and Third Circuit jurisprudence on economic shams as hinging on their "fleeting and inconsequential" nature. Appellant's Br. at 35, citing ACM Partnership , 157 F.3d at 250. For example, it points to the corporate reorganization plan in Gregory ending as soon as its use was served, and to Knetsch, Wexler, and Lerman . It argues that in contrast to those "fleeting and inconsequential investments," the COLI VIII plan was a long-term investment.

Camelot misreads the case law on this point. Duration alone cannot sanctify a transaction that lacks economic substance. The appropriate examination is of the net financial effect to the taxpayer, be it short or long term. The

---

5. As the District Court pointed out, this was a particularly telling feature of the plan: "MBL recognized that this zero net equity feature was a significant indicator of the COLI VIII plan's lack of economic substance. When a tax lawyer for a COLI broker suggested to MBL's Wendell Bossen that it would be very difficult to convince a court of the economic substance of the COLI arrangement given the'uninterrupted string of zeros' in the net equity column of the COLI VIII product illustrations, Bossen recommended to McCamish that the net equity column be eliminated 'since anything we can do to remove self-made traps in the illustration would be helpful.' " CM Holdings, 254 B.R. at 632.

point of our analysis in ACM Partnership is that the transactions "offset one another with no net effect on ACM's financial position." ACM Partnership, 157 F.3d at 250. It is not the brevity of the transaction that renders it a sham, but the fact that it is solely tax-driven. The net effect in all these cases is the same: a flow of transaction upon transaction that yields no appreciable financial benefit to the taxpayer absent tax deductions.

Regardless, the individual transactions that made up the COLI plan were "fleeting and inconsequential." Take, for

example, the dividend payment mechanism of years 4-7, where a premium payment was made and simultaneously credited back in the form of a dividend from MBL, so that the net payment was far less than the credited one. Or consider that the use of sophisticated computer programs ensured that the net value of each policy was zero at the end of the month, taking up what little value MBL credited to the policy each month. Each separate transaction was fleeting and insubstantial. Repeating a series of such impermanences cannot lend substance to the scheme as a whole.

Comparing this case with Knetsch provides a helpful gloss on the objective economic substance inquiry. Striking similarities exist. Knetsch purchased $4,000,000 in annuities paying 2.5% annual interest, financed with nonrecourse loans with an interest rate of 3.5%, secured by the bonds themselves. This "investment" cost more money than it made, unless interest deductions were factored into the calculation. The Supreme Court found that the transaction lacked economic substance. As the Court in American Electric Power v. United States Power[6] pointed out,

> [t]he similarities between Knetsch's annuity transactions and the AEP COLI VIII plan are striking. They include first-day, first-year loans, which paid for all but a small percentage of the total premium and generated substantial interest deductions. There was a pattern of annual borrowings, which consumed nearly

---

6. American Electric Power involved the same underlying COLI plan at issue in this case.

12

> all of the equity in the annuity bonds and produced even more tax-deductible interest expense. The potential economic benefit of the annuity bonds, substantial annuity payments thirty years hence, was wiped out by the borrowings. The only real benefit to Knetsch was the tax deductions.

American Electric Power, 136 F. Supp. 2d 762, 793 (S.D. Ohio 2001).

Camelot attempts to distinguish Knetsch because the potential benefit of the annuity bonds was the "mere pittance" of $1,000. Appellant's Br. at 17. In contrast, Camelot argues, the potential death benefits to Camelot, and those actually realized in the early years of the plan ($1.3 million in total mortality gains), represent more than a "mere pittance." But even with these mortality gains the plan was not profitable, and the chance of mortality gains ever being enough to render the plan pre-tax profitable was essentially nonexistent. MBL designed the policies to obviate the risk of mortality loss: the policy was designed to be "mortality neutral," with neither side making money on

the risk of employees dying early or late. Things did not go as planned, however, and unexpectedly high death benefits were paid from 1996 to December 1998. Rather than accept this loss as one that may sometimes occur no matter how carefully actuaries attempt to chart the vagaries of life and death, Hartford assessed surcharges to recoup its losses and ensure mortality neutrality in the future. CM Holdings, 254 B.R. at 634.

Amicus Hershey Foods Corp. ("Hershey") argues that our analysis of the nontax benefits of the COLI policies is flawed, and that we must "gross up" anticipated tax benefits in order to assess fairly pre-tax effects on Camelot's economic position. "Such a gross-up would have produced positive pre-tax numbers for Camelot on an overall basis." Amicus Br. at 16. The illustration Hershey offers to support its position is a deceptively simple one. It posits a loan of 5% to pay for a tax-free municipal bond paying 4% and a taxable corporate bond paying 6%. Depending on the buyer's tax rate, there may be situations where the 4% tax-free bond is the more profitable investment. But purchase of a 4% tax-free municipal bond

with the proceeds of a 5% loan makes no economic sense without consideration of the tax benefit.

The District Court did not consider grossed-up numbers and offered three reasons for its refusal. It first pointed out that Camelot offered no expert testimony at trial to counter Government testimony that "grossing up tax-favored income is not a correct financial method to analyze the economic substance of the transaction because a gross-up does not reflect the actual cash flows of an investment." CM Holdings, 254 B.R. at 626. Second, all the illustrations Camelot considered at the time of policy purchase focused on after-tax consequences of the plan. None of them showed pre-tax cash flows, "much less grossed-up pre-tax cash flows." Id. Finally, there is no evidence in the record that Camelot compared the grossed-up returns of the plan to any taxable investments available at the time.

For the reasons stated by the District Court, as well as for one more fundamental one, grossing up is not appropriate here. Hershey makes a logical leap in equating the economic substance analysis with a situation "without tax benefits being taken into account." Amicus Br. at 17. Knetsch did not gross up the benefit to the taxpayer when evaluating the substance of the transaction. The point of the analysis is to remove from consideration the challenged tax deduction, and evaluate the transaction on its merits, to see if it makes sense economically or is mere tax arbitrage. Courts use "pre-tax" as shorthand for this, but they do not imply that the court must imagine a world without taxes, and evaluate the transaction accordingly. Instead, they focus on the abuse of the deductions claimed: "[w]here a transaction has no substance other than to create deductions, the transaction is disregarded for tax

purposes." Wexler, 31 F.3d at 122. Choosing a tax-favored investment vehicle is fine, but engaging in an empty transaction that shuffles payments for the sole purpose of generating a deduction is not.

Finally, Camelot offers its force-out of $26 million to pay off policy loans, resulting in a taxable gain of over $17 million, as evidence of the COLI VIII plan's non-tax effect on the taxpayer. Appellant's Br. at 33. Although Camelot reported the gain, it concedes that it "was ultimately able to

14

net the force-out income against a net operating loss ("NOL") carryforward." Id. at 34. Camelot cannot cite the reporting of gain on which it ultimately paid no taxes as evidence of a non-tax effect.

2. Subjective Business Purpose

On appeal Camelot does not assert any non-tax motives for the COLI VIII plan. Instead, it argues that the District Court erred in using a subjective analysis to determine that the plan was an economic sham. It maintains that the transaction had objective non-tax economic effects, and thus the Court must not look further. Camelot's view of the law is mistaken, however. From the time of Gregory's analysis of the "rational business purpose," courts have evaluated taxpayers' purposes when determining whether a transaction has economic substance.

The subjective prong provides that "interest charges [are] not deductible if they [arise] from a transaction entered into without expectation of economic profit and [with] no purpose beyond creating tax deductions." ACM Partnership, 157 F.3d at 253 (citation omitted). There is Supreme Court language that at first seems at odds with a subjective inquiry into a transaction's business purpose. In Gregory the Court remarked that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory, 293 U.S. at 469. However, in the next breath it added, "[b]ut the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Id. If Congress intends to encourage an activity, and to use taxpayers' desire to avoid taxes as a means to do it, then a subjective motive of tax avoidance is permissible. But to engage in an activity solely for the purpose of avoiding taxes where that is not the statute's goal is to conduct a sham transaction.

In the case of Gregory, the taxpayer made use of a corporate reorganization for the sole purpose of avoiding income tax liability. Because this was not what the corporate reorganization statute had intended, the taxpayer lost. This is what distinguishes Sacks v. Commissioner, 69

15

F.3d 982 (9th Cir. 1995), a case Camelot cites, from this case. Appellant's Br. at 22. Sacks involved the question of whether depreciation deductions and investment credits were allowed on a transaction involving the sale and leaseback of solar energy equipment. Id. at 984-85. The Ninth Circuit reasoned that both federal and state legislatures had specifically encouraged investment in solar energy and thereby "skewed the neutrality of the tax system." Id. at 991.

Amicus Hershey attempts to infer Congressional approval of the COLI interest deductions from their gradual phasing out by Congress in the years subsequent to 1996. Although the taxpayer in Winn-Dixie Stores v. Commissioner, 113 T.C. 254, 290 (T.C. 1999), similarly argued that this"soft landing" implied Congressional approval of the deductions pre-1996, in fact the Joint Committee report stated that "the IRS would not be precluded from applying common-law doctrines or statutory or other rules to challenge corporate-owned life insurance plans to which present law rules apply." Description Of Revenue Provisions Contained In The President's Fiscal Year 1997 Budget Proposal, Staff of the Joint Committee on Taxation, at 82 (March 27, 1996). Section 264's 4-of-7 safe harbor was designed specifically to recognize the importance of borrowing on policies for "other than tax saving purposes." S. Rep. No. 830 (1964), reprinted in 1964 U.S.C.C.A.N 1673, 1750 (emphasis added). Congress gave taxpayers a narrow window of opportunity in which to use this deduction; Camelot's loading dividends attempted to force this window open too far. The loading dividends in years 4-7 are a transparent effort to circumvent the law by following its letter while violating its spirit.

Camelot received 20- and 40-year illustrations of the proposed plan's operation before it finalized its agreement. CM Holdings, 254 B.R. at 625. The District Court's analysis concluded that "with the benefit of the policy loan interest deductions, Camelot's COLI VIII plan was projected to produce large positive cash flows, but . . . absent those loan interest deductions, the plans would produce negative cash flows for each and every year and in the aggregate." Id. at 625. The benefits most life insurance plans offer, chiefly

16

tax-free death benefits and tax-deferred inside build-up, were conspicuously absent from Camelot's COLI VIII plan. MBL designed it to be "mortality neutral." 7 The potential tax-free inside build-up was never realized because the plan was carefully calculated to ensure that there was zero net equity at the end of each month. Id. at 631.

Another clue that Camelot's motives were strictly tax-driven is its choice of the highest possible interest rate for the policy loans.

> When a transaction is structured so that the borrower
> actually benefits from a higher loan interest rate and
> the borrower is permitted to chose [sic] its own interest
> rate from a range of rates that begins with a rate that
> far exceeds the industry maximum, the interest rate
> component of the transaction lacks economic
> substance.

American Electric Power, 136 F. Supp. 2d at 790. There is
no explanation for Camelot's choosing the high interest rate
except that it permitted a larger deduction.

Finally, the plan was marketed as a tax-driven
investment. A member of the Newport Group first
introduced the plan by describing that "the key factor is
being able to absorb the interest deductions." CM Holdings,
254 B.R. at 638. Newport offered suggestions about how to
tailor the program "to best fit Camelot's taxable income
expectations." "The policy was rushed into effect on
February 20, 1990, the day before Congressional hearings
on COLI legislation were to begin." Id. at 640. When
weighing the pros and cons of the plan, the chief dangers
noted to Camelot were "1) a retroactive tax law change[,] 2)
Camelot's failure to generate taxable income over several
years in a row[, and] 3) IRS attack." Id. at 590. Camelot
plainly understood that tax advantage was the engine
driving this investment.

---

7. As noted above, although Camelot did receive some "mortality gains"
in the early years of the plan, Hartford even corrected for these by
instituting surcharges to recoup losses and ensure neutrality going
forward. Notwithstanding these early "windfall" gains, the plan was not
pre-tax profitable.

To summarize, the purchase of the COLI VIII plan had no
net effect on Camelot's economic position, so it fails the
objective prong of economic sham analysis. There was no
legitimate business purpose behind the plan, so it fails the
subjective prong as well. The District Court was correct in
holding that the transaction as a whole lacked economic
substance, and thus was an economic sham.8

B. Factual Sham

The District Court's holding that the COLI transaction as
a whole lacked economic substance, and thus was an
economic sham, is undoubtedly correct. Thus, we do not
reach the issue of whether the separate components of the
transaction were factual or economic shams. However, we
must clarify that we do not find the loading dividends to be
factual shams. Factual shams are "transactions" that never
actually occurred. Lerman v. Commissioner, 939 F.2d 44,
48 n.6 (3d Cir. 1991). A circular netting transaction, where
different loans and payments are deemed to occur

8. In addition to analyzing the objective economic substance and subjective business motivation, a few courts have read the Supreme Court's holding in Frank Lyon Co. v. United States, 435 U.S. 561 (1978), to require that a trial court assess the transaction's economic consequences for other parties. To the extent that the taxpayer on the opposite side of the transaction reported as income what the taxpayer in question reported as an expense, the transaction becomes more palatable to the IRS. Id. at 580. The recipient's reported income balances the payor's deduction. Under this logic, if MBL reported interest payments to it as income, Camelot's deduction arguably would have more economic substance.

In American Electric Power, which involved the same underlying COLI plan at issue here, the Court held that although MBL reported the premiums and policy loan interest paid to it as income, this reporting did not alter the insurance company's net economic position because MBL's reported income was free of the taxes usually accompanying such income. American Electric Power, 136 F. Supp. 2d at 789. MBL offset the income from the policy loan interest paid to it with the portion of that interest (nearly all) it contributed to the inside build-up of the COLI policies, so that it only paid tax on the one-percent "spread" between the two sums. Id. Just as in American Electric Power, the minimal net consequences here to the insurers do not lend substance to the COLI policies.

18

simultaneously (and thereby offset each other), is not by definition a factual sham. As the District Court pointed out, the simultaneous netting of the payment and the loan with the policy value as collateral that occurred in years 1-3 is common in the industry, and is a transaction with economic substance. CM Holdings, 254 B.R. at 602. The loading dividends of years 4-7 were similar simultaneous netting transactions that "actually occurred," and are therefore not factual shams. They were not "performed in violation of some of the background assumptions of commercial dealing, for example arms-length dealing at fair market values." Horn, 968 F.2d at 1236 n.8. The fact that these dividends were not industry practice is, however, evidence that they were economic shams.

C. Correctness of Penalties for Inaccuracy

We affirm the District Court's application of accuracy-related penalties for Camelot's understatements of income on its returns. There was no substantial authority for the interest deduction. CM Holdings, 254 B.R. at 647-48. Only one case has broadened the common law exception for cases of first impression, which prevents the imposition of penalties, to the field of accuracy-related penalties for substantial understatement. Mitchell v. Commissioner, 2000 WL 428644, T.C.M. (RIA) 2000-145 (2000). But even this exception is reserved for issues where the statutory language was unclear. Neonatology Assoc. v. Commissioner, No. Civ. 01-2862, 2002 WL 1747513, at *11 n.24 (3d Cir. July 29, 2002). As the District Court pointed out, in this case there is no unclear statutory language, only"applying novel facts to the judicially created sham transaction

doctrine." 254 B.R. at 653.

*****

The COLI policies lacked economic substance because
they had no net economic effect on Camelot and existed
solely for the purpose of avoiding taxes. The District Court
was correct in applying accuracy-related penalties for
Camelot's understatement of income. We therefore affirm.

19


A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

20