T.C. Memo. 2005-254


UNITED STATES TAX COURT


CLAYMONT INVESTMENTS, INC., AS SUCCESSOR IN INTEREST TO NEW CCI,
INC. AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14384-99, 9129-00.    Filed October 31, 2005.


F is a foreign corporation.  P, a U.S. subsidiary
of F, is a film processing company.  On its amended
1992 and 1993 Federal income tax returns, P claimed
sec. 165, I.R.C., loss deductions relating to the
alleged termination of three customer relationships.
In 1988, S1, a U.K. subsidiary of F, lent £29,498,525
(i.e., the equivalent of $50 million) to S2, a
subsidiary of P.  In 1996, S2 and S3 (i.e., another
subsidiary of P), entered into a note assumption
agreement, which provided that S3 would assume S2's
obligations relating to the 1988 loan.  Because of the
favorable currency exchange rates (i.e., between the
dollar and the pound), at the time of the assumption,
S2 could have repaid S1 with $45,811,209 instead of $50
million.  As a result, S2 realized $4,188,791 in
foreign exchange gain when its obligations were
assumed.  On its 1996 consolidated return, P reported
the interest expense paid by S3 to S1 and deferred the
foreign exchange gain relating to the intercompany
transaction between S2 and S3.  R determined that P was

not entitled to the sec. 165, I.R.C., loss deductions, interest expense deduction, or deferral of foreign exchange gain.

1.   Held:  P did not establish that it had a tax basis in each of the three terminated relationships and, thus, is not entitled to deduct losses related to these relationships.

2.   Held, further, R's section 482, I.R.C., adjustments, relating to the intercompany transaction, are arbitrary and capricious.

3.   Held, further, the economic substance doctrine is inapplicable.

4.   Held, further, pursuant to sec. 1.1502-13, Income Tax Regs., P is entitled to defer foreign exchange gain relating to the intercompany transaction between S2 and S3.


William E. Bonano, Richard E. Nielsen, and Annie Huang (specially recognized), for petitioners.

James P. Thurston, Kevin G. Croke, and Usha Ravi, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, Judge:  The issues for decision are whether:
(1) Petitioners'[1] claimed losses relating to customer

---

[1]  All references to petitioners are to Claymont Investments, Inc., and its consolidated subsidiaries.  All references to petitioner are to Claymont Investments, Inc.

relationships are deductible pursuant to section 165;[2] (2) petitioners' arm's-length loan may, pursuant to section 482, be recast as a new loan to reflect the interest rate at the time of the subsequent assumption of the arm's-length loan; and (3) petitioners are allowed to defer recognizing foreign exchange gain relating to 1996.

FINDINGS OF FACT

I. The Technicolor Acquisition

Carlton Communications Plc (Carlton), a United Kingdom (UK) corporation, is the parent company of petitioner, Colorado Acquisition Corp., and Technicolor Holdings, Ltd. (Holdings).[3] Petitioner and Colorado Acquisition Corp. are U.S. corporations, and Holdings is a U.K. corporation. Carlton International Corp. (CIC) and Carlton International Holdings, Inc. (CIHI), are wholly owned U.S. subsidiaries of petitioner.

On October 7, 1988 (the acquisition date), Colorado Acquisition Corp. acquired from the Revlon Group, Inc., all the stock of Technicolor Holdings, Inc. (Technicolor).[4] The parties

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Holdings was formerly known as Colorado Holdings, Ltd.

[4] As a result of several internal reorganizations of Carlton's domestic subsidiaries during the years in issue, petitioner acquired the stock of Technicolor.

to the acquisition jointly elected, pursuant to section 338(h)(10), to treat the acquisition of the stock as an asset acquisition. At the time of the acquisition, Technicolor's primary activities were film processing and videocassette duplication. The film division provided film processing and related services to major film studios. The videocassette duplication division manufactured prerecorded videocassettes for home video and nontheatrical markets.

Technicolor, a leading film processing company, had an experienced management team, sophisticated equipment, and proximity to the studios' filming locations. In addition, personal relationships, between Technicolor's and the major film studios' executives, facilitated client development and retention.

The film processing market was extremely competitive, and major studios used their strong bargaining power to negotiate large up-front payments (e.g., Technicolor made a $65 million payment to renew a contract with Walt Disney Pictures), volume discounts, "most-favored-nation" provisions,[5] and other contractual concessions from film processing companies. Technicolor's major competitors were Deluxe Laboratories, Inc.

---

[5] Most-favored-nation provisions ensured that a customer would get the same pricing as any other customer ordering the same volume of services.

(Deluxe); Metrocolor; and CFI, a division of Republic Pictures Corp.

A.    The Preacquisition Review

Prior to the acquisition, Carlton hired Coopers & Lybrand (C&L) to value Technicolor's assets.  C&L allocated, pursuant to section 1.338(b)-2T, Temporary Income Tax Regs., 51 Fed. Reg. 3591 (Jan. 29, 1986), in effect during 1988, $619,194,000 of the proposed purchase price to the basis of Technicolor's assets. Section 1.338(b)-2T, Temporary Income Tax Regs., supra, required that acquired assets be divided into four classes.  Class I assets are cash and cash equivalents.  Class II assets are certain liquid tangible assets including readily marketable securities.  Class III assets are all assets other than those in classes I, II, and IV.  Class IV assets are intangible assets (i.e., in the nature of goodwill and going concern value) not allocated to class I, II, or III.  The basis allocated to each successive class is based on the fair market value (FMV) of a company's assets.

Because there were no class I or II assets, C&L allocated the basis attributable to Technicolor's assets first to class III.  Class III consisted of Technicolor's tangible assets, current assets (e.g., accounts receivable), investments in subsidiaries, and amortizable intangibles.  C&L then allocated the remaining basis to class IV.

B.    Technicolor's Customer Relationships

In 1986, Paramount Pictures Corp. (Paramount), a noncontractual customer of Technicolor since 1923, entered into its first contract with Technicolor.  Under this contract, Technicolor received one-half of Paramount's film processing business.  In 1987, Technicolor became Paramount's exclusive film processor.  In 1992, after the expiration of its contract with Technicolor, Paramount entered into a contract with Deluxe.  After Paramount signed with Deluxe, it continued to do business with Technicolor under an exception to an exclusivity provision (i.e., a contractual provision in which a customer agrees to purchase a particular product or service from only one company) in Paramount's contract with Deluxe.

Metro-Goldwyn-Mayer/United Artists (MGM/UA) became a Technicolor customer in 1924.  In 1987, MGM/UA split its film processing work between Technicolor and Deluxe and became a significant noncontractual customer of Technicolor.  At the time of the acquisition, Technicolor did not have a film processing contract with MGM/UA.  In addition, the preacquisition review did not project 1989 revenues relating to MGM/UA.  In 1991, MGM/UA entered into a contract with Deluxe, but continued to do business with Technicolor.

On October 21, 1988, Management Co. Entertainment Group, Inc. (MCEG), a newly formed independent film production company,

entered into a film processing contract with Technicolor. Technicolor lent MCEG $5.5 million to induce MCEG to enter into the contract. Because of concerns about MCEG's long-term viability, Technicolor secured the loan with video distribution royalty rights from four MCEG films. If the distribution royalties were insufficient, MCEG was obligated to repay the loan by October 31, 1991 (1988 loan). Technicolor's sales plan, dated October 18, 1988, for fiscal year 1989, did not list MCEG as a customer. On October 31, 1990, MCEG was placed into involuntary bankruptcy, and on March 19, 1992, the U.S. Bankruptcy Court approved MCEG's chapter 11 reorganization plan. The successor entity, MCEG Sterling, Inc., did not continue doing business with Technicolor.

C. The 1989 Asset Valuation

On June 23, 1989, C&L prepared a valuation report (1989 Valuation) that determined the FMV of Technicolor's assets for purposes of allocating the purchase price to those assets. C&L divided the acquired assets into four classes, discussed supra in section I.A. Class III included Technicolor's customer relationships. C&L determined the value of the relationships by computing the present value of the net realizable earnings that these assets would generate over their remaining lives. The remaining lives were determined by adding a 3-year projected extension to each relationship's termination date. The remaining

lives for the Paramount, MGM/UA, and MCEG relationships were 6.25, 6.33, and 6.08 years, respectively. Beginning in 1989, Technicolor claimed amortization deductions based on the values C&L determined for the Paramount, MCEG, and MGM/UA relationships. Petitioners, on their 1992 tax return, deducted the remaining adjusted basis of the Paramount relationship. Similarly, on their 1993 tax return, petitioners deducted the remaining adjusted bases of the MGM/UA and MCEG relationships.

### D. The Closing Agreement

During the examination of petitioners' 1988 through 1992 returns, respondent challenged the bases and lives ascribed to the relationships. The parties resolved the valuation dispute under the Intangibles Settlement Initiative Program. In a closing agreement (i.e., executed on September 16, 1994, by petitioners and April 29, 1997, by respondent) the parties agreed to reduce the bases of the relationships by 15 percent with no adjustment to the remaining lives as determined in the 1989 Valuation. In addition, the parties agreed that the basis amounts allocated to the class IV nonamortizable intangible assets would be increased by $36,458,000.

### E. The 1994 Goodwill Valuation

In a letter dated September 30, 1994 (1994 Valuation), C&L determined the value of film customer relationships acquired in the purchase of Technicolor. In preparing the 1994 Valuation,

C&L relied on the 1989 Valuation and the preacquisition review. C&L determined a total value of the customer relationships using a capitalization of earnings approach. It further determined that the appropriate earnings stream to a potential acquirer of these relationships would be the after-tax earnings generated by each relationship projected into perpetuity. Thus, it assigned value to the portions of the relationships extending beyond the initial periods Technicolor attributed to the relationships. In both the 1989 and 1994 valuations, C&L used projected annual pretax earnings to value the Paramount, MCEG, and MGM/UA customer relationships. After it valued the customer relationships, C&L subtracted the value of the customer relationships (i.e., as modified by the closing agreement) and determined that the values of the Paramount, MCEG, and MGM/UA customer relationships were $27,496,000, $5,569,000, and $2,698,000, respectively.

On July 7, 1997, petitioners filed amended tax returns relating to fiscal years ending September 30, 1992 and 1993, and claimed deductions based on the 1994 Valuation. On their amended return for 1992, petitioners reported a $27,496,000 loss deduction attributable to the alleged termination of the Paramount relationship.[6] Similarly, on their amended return relating to 1993, petitioners reported a $5,569,000 loss

---

[6] The $27,496,000 claimed loss contributed to a net operating loss that petitioners carried forward and deducted in the fiscal years ending Sept. 30, 1993 and 1994.

deduction attributable to the alleged termination of the MCEG relationship and a $2,698,000 loss deduction attributable to the alleged termination of the MGM/UA relationship.[7]

## II. Loan Assumption and Foreign Exchange Gain Deferral

On October 7, 1988, Holdings and CIC entered into a note purchase agreement (Holdings/CIC transaction). The agreement provided that Holdings would lend CIC £29,498,525 (i.e., the equivalent of $50 million) in exchange for a promissory note (note). The note had a 10-year term and required interest payments calculated at an 11.5-percent rate, compounded semi-annually and payable annually. All principal and accrued and unpaid interest were due on October 7, 1998, but the principal could be repaid at any time without penalty.

In 1996, Carlton's board of directors decided to acquire RSA Advertising, Ltd. (RSA), and Cinema Media, Ltd., a subsidiary of RSA. A portion of this acquisition would be funded with funds from CIHI. On June 28, 1996, CIC and CIHI entered into a note assumption agreement (CIC/CIHI transaction). This agreement provided that CIC would pay CIHI $49,784,881 in exchange for CIHI's assumption of CIC's obligations to Holdings. The $49,784,881 was the amount necessary to pay off the outstanding

---

[7] In a third amendment to petition, petitioner, in the alternative, contends that the loss relating to MCEG is properly deductible for the year ending Sept. 30, 1992, 1993, or 1995. With respect to MGM/UA, petitioner contends that the loss is properly deductible for the year ending Sept. 30, 1992.

principal and accrued interest due on the note (i.e., principal of £29,498,525, then equivalent to $45,811,209, and accrued interest of $3,973,672). The note assumption agreement further provided that CIC remained liable to Holdings but had recourse against CIHI if CIHI defaulted. CIHI performed all of its duties pursuant to the terms of the agreement. Holdings was not a party to the agreement.

The dollar gained value relative to the pound from the date Holdings and CIC executed the note (i.e., on October 7, 1988, $1 was equivalent to £.59050) to the date CIHI assumed the note from CIC (i.e., on June 28, 1996, $1 was equivalent to £.6460). On the latter date, CIC realized a $4,188,791 foreign exchange gain (i.e., on June 28, 1996, CIC could have repaid the principal balance of £29,498,525 with $45,811,209 rather than $50 million). Petitioners, on their 1996 consolidated return, which included CIC and CIHI, reported the foreign exchange gain and, pursuant to section 1.1502-13, Income Tax Regs., deferred recognition of the gain as an intercompany transaction (i.e., a transaction between corporations that are members of the same consolidated group).

On June 2, 1999, and August 30, 2000, respondent issued notices of deficiency to petitioners relating to tax years ending September 30, 1993, 1994, and 1995,[8] and 1996, respectively, and determined the following deficiencies in Federal income taxes:

---

[8] The 1995 taxable year is no longer at issue.

| Year | Deficiency |
|------|------------|
| 1993 | $4,196,196 |
| 1994 | 2,626,712 |
| 1995 | 307,496 |
| 1996 | 34,839,469 |

In the August 30, 2000, notice of deficiency, respondent, pursuant to section 482, made adjustments to reflect the arm's-length interest rate applicable at the time of the assumption and determined that petitioners should recognize the foreign exchange gain realized in 1996.  On November 6, 2000, the Court granted the parties' joint motion to consolidate docket Nos. 14384-99 (i.e., relating to 1993 through 1995) and 9129-00 (i.e., relating to 1996) for purposes of trial, briefing, and opinion.  In respondent's amendment to answer in docket No. 9129-00, filed July 16, 2002, respondent asserted the economic substance doctrine as an alternative theory in support of his determination that the assumption agreement between CIC and CIHI should be restructured.

Petitioner's principal place of business was Claymont, Delaware, at the time the petition was filed.

OPINION

I.   The Valuation of Customer Relationships

Section 165(a) allows a deduction for a business loss sustained during a year where the loss is not compensated for by insurance or otherwise.  The amount of a deduction pursuant to

section 165(a) is limited to the taxpayer's adjusted tax basis in the asset lost.  Sec. 165(b).

Petitioners contend that, pursuant to section 165, they are entitled to deduct the losses attributable to their customer relationships with Paramount, MGM/UA, and MCEG because the relationships were irrevocably lost when Paramount and MGM/UA executed film processing contracts with Deluxe and MCEG went bankrupt.  Respondent contends that petitioners have not accurately established their adjusted tax bases in the relationships.

Petitioners' expert determined that immediately prior to the Technicolor acquisition the total value of the Paramount, MGM/UA, and MCEG relationships was $23,882,000.[9]  In determining the value of the relationships, he assumed that each relationship would continue in perpetuity.  He asserted that his assumption was based on Carlton's expectation at the time of the acquisition and stated that "it is reasonable and likely, that Carlton's management in reviewing the acquisition, would have assumed that the historical patterns of long-term client relationships would be expected to continue."  We disagree.

---

[9]  Petitioners, in accordance with their expert's analysis, reduced the value attributable to the Paramount, MGM/UA, and MCEG customer relationships from $27,496,000, $2,698,000, and $5,569,000 (i.e., the amounts calculated in the 1994 Valuation and claimed on petitioners' amended 1992 and 1993 returns) to $18,328,000, $1,814,000, and $3,740,000, respectively.

In the 1980s, the film processing industry became extremely competitive, and studios were readily changing film processing companies and negotiating lower prices, large up-front incentive payments, and most-favored-nation provisions. As a result, Technicolor was experiencing a high rate of client turnover. In fact, only 2 of Technicolor's 12 major contractual customers in 1983 was a customer on the acquisition date. Carlton's expectation that MCEG, MGM/UA, and Paramount would remain customers in perpetuity is unreasonable and not supported by the evidence.

With respect to MCEG, petitioners' expectation is unreasonable because MCEG did not, prior to the acquisition date, have a contractual relationship with, or generate any income for, Technicolor. Moreover, MCEG had no track record, a dubious future, and no film processing history with Technicolor or any other film processing companies. Indeed, Technicolor had concerns about MCEG's long-term viability (i.e., subsequently validated by MCEG's 1992 bankruptcy) and required MCEG to collateralize the 1988 loan. Thus, petitioners failed to establish a value relating to the MCEG relationship. See Rule 142(a)(1); Newark Morning Ledger Co. v. United States, 507 U.S. 546, 566 (1993).

Similarly, petitioners' expectation, that MGM/UA and Paramount would remain customers in perpetuity, was unreasonable.

Bernard Cragg, Carlton's finance director, testified that at the time Carlton agreed to the purchase price of the acquisition, he did not know exactly how long Paramount or MGM/UA would remain a customer, and that Carlton did not have detailed information relating to Technicolor customers. In addition, with respect to MGM/UA, documents contemporaneous with the acquisition stated that Technicolor's relationship with MGM/UA was "uncertain". For example, the disclosure schedule to the stock purchase agreement and the preacquisition review stated that "MGM/UA is a company in a state of change", "Technicolor has no written agreement with MGM/UA", and "it is unclear whether Technicolor will receive any business from MGM/UA at all in the future." Furthermore, with respect to Paramount, although it had a history of doing business with Technicolor at the time of the acquisition, it had been a contractual customer for less than 2 years. At trial, Earl Lestz, president of Paramount's Studio Group, testified that Paramount never gave Technicolor or Carlton any reason to expect that Paramount would remain a customer for any extended period of time. Mr. Lestz's testimony, the competitive nature of the film processing market, and Technicolor's high client turnover rate before the acquisition, establish that Carlton's expectation of a permanent relationship with Paramount was not reasonable.

In short, petitioners did not establish tax bases with respect to the customer relationships with MCEG, Paramount, and

MGM/UA.  See <u>Newark Morning Ledger Co. v. United States</u>, <u>supra</u> at 566; <u>Capital Blue Cross & Subs. v. Commissioner</u>, 122 T.C. 224, 248 (2004).  Moreover, we are unable to ascribe to any of the relationships a limited useful life of a specific duration.  Cf. <u>Capital Blue Cross & Subs. v. Commissioner</u>, <u>supra</u> at 255-257. Accordingly, we sustain respondent's determinations disallowing petitioners' claimed deductions.

II. <u>Tax Consequences of the Loan Assumption</u>

Respondent, relying on section 482, contends that the CIC/CIHI transaction was not arm's length and should be:

> recast * * * [as] a payment by CIC of $49,784,881 to Holdings to fully extinguish its debt followed by a new loan from Holdings to CIHI in the same amount at the arm's length rate of 8%.  The excess 3.5% interest paid by CIHI to Holdings should be disallowed as a deduction and deemed distributed by CIHI to Petitioner and by Petitioner to Carlton followed by a constructive contribution of this amount by Carlton to Holdings.

Under section 482, the Commissioner has the authority to reallocate income among members of a controlled group where a controlled taxpayer's taxable income is not equal to what it would have been had the taxpayer been dealing at arm's length with an uncontrolled taxpayer.  Sec. 1.482-1(f)(1), Income Tax Regs.  If the Commissioner, however, abuses his discretion and makes a determination that is arbitrary, capricious, or unreasonable, that determination will not be sustained.  See <u>Seagate Tech., Inc. v. Commissioner</u>, 102 T.C. 149, 164 (1994);

<u>Bausch & Lomb, Inc. v. Commissioner</u>, 92 T.C. 525, 582 (1989), affd. 933 F.2d 1084 (2d Cir. 1991).

    A.    <u>The Applicability of Section 1.482-2(a)(1), Income Tax Regs., to the Holdings/CIC Transaction or CIC/CIHI Transaction</u>

Section 482 allows the Commissioner to make adjustments to reflect an arm's-length rate of interest "Where one member of a group of controlled entities makes a loan or advance * * * or otherwise becomes a creditor of, another member of such group and * * * charges interest at a rate which is not equal to an arm's length rate of interest".  Sec. 1.482-2(a)(1)(i), Income Tax Regs.; <u>Latham Park Manor, Inc. v. Commissioner</u>, 69 T.C. 199, 210-211 (1977), affd. without published opinion 618 F.2d 100 (4th Cir. 1980).

Section 1.482-1(i)(7), Income Tax Regs., broadly defines a transaction as "any sale, assignment, lease, license, loan, advance, contribution, or any other transfer of any interest in or a right to use any property * * * or money".  Because the Holdings/CIC transaction was a loan and CIC/CIHI transaction involved a transfer of an "interest in or a right to use * * * money", both transactions meet that definition.  The Holdings/CIC and CIC/CIHI transactions, however, are separate transactions. The CIC/CIHI transaction was entered into 8 years after the Holdings/CIC transaction, and there is no evidence that this transaction was under consideration at the time Holdings lent the

$50 million to CIC. Thus, the Holdings/CIC transaction and the CIC/CIHI transaction must be analyzed separately. See sec. 1.482-1(f)(2)(i), Income Tax Regs. (stating transactions will be analyzed on a transaction by transaction basis unless "such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's length consideration for the controlled transactions").

### 1. Holdings/CIC Transaction

In 1988, Holdings lent £29,498,525 (i.e., $50 million) to CIC at an 11.5-percent interest rate. Both parties agree that, at the time of the loan, 11.5 percent was an arm's-length interest rate. Thus, section 1.482-2(a)(1), Income Tax Regs., is inapplicable to the Holdings/CIC transaction.

### 2. CIC/CIHI Transaction

CIC and CIHI, petitioner's subsidiaries, are members of the same consolidated group. In 1996, CIC and CIHI executed an assumption agreement in which CIHI agreed to assume all of CIC's obligations, pursuant to the note, in exchange for $49,784,881. Both parties agree that, at the time of the transfer, CIHI could have borrowed the $49,784,881 at an arm's-length rate of 8, rather than the 11.5, percent. Pursuant to the assumption agreement, if CIHI failed to make any of its payments, CIC was entitled to seek legal recourse against CIHI. Section 1.482-

2(a)(1), Income Tax Regs., is applicable to the CIC/CIHI

transaction because CIC became a creditor of CIHI and the 11.5-

percent interest rate was not arm's length. Del. Code Ann. tit.

6, sec. 1301(3) and (4) (2005) (a creditor is defined as a person

who has a right to payment).

Respondent cites section 1.482-1(d)(3)(ii)(B) and

(f)(2)(ii), Income Tax Regs., as authority for restructuring the

transfer between CIC and CIHI as a new loan between Holdings and

CIHI. Section 1.482-1(d)(3)(ii)(B), Income Tax Regs., states:

> The contractual terms, * * * agreed to in writing * * *
> will be respected if such terms are consistent with the
> economic substance of the underlying transactions. In
> evaluating economic substance, greatest weight will be
> given to the actual conduct of the parties, and the
> respective legal rights of the parties * * *. If the
> contractual terms are inconsistent with the economic
> substance of the underlying transaction, the district
> director may disregard such terms and impute terms that
> are consistent with the economic substance of the
> transaction.

Respondent contends that the terms of the transaction are

inconsistent with the transaction's economic substance.

Respondent further contends that arm's-length parties would not

have entered into this transaction because the market rate of

interest was 8 percent at the time of the assumption. As a

result, respondent recast the CIC/CIHI transaction as a repayment

by CIC to Holdings of the $49,784,881 followed by a new loan from

Holdings to CIHI at an 8-percent interest rate. Respondent

further asserts that the excess 3.5 percent interest paid to

Holdings by CIHI must be redistributed as a "deemed * * * [distribution] by CIHI to Petitioner and by Petitioner to Carlton followed by a constructive contribution of this amount by Carlton to Holdings."  We disagree for reasons set forth below.

First, the interest rate Holdings charged CIC was arm's length and, as a result, section 1.482-2(a)(1), Income Tax Regs., is not applicable to the Holdings/CIC transaction.  Because the Holdings/CIC and CIC/CIHI transactions are separate transactions, respondent may make reallocations only between CIC and CIHI. Respondent, however, seeks to consolidate and recast both transactions as a repayment of the loan between Holdings and CIC followed by a new loan between Holdings and CIHI, thus triggering the recognition of foreign exchange gain by CIC.

Second, respondent was not authorized, pursuant to section 1.482-1(d)(3)(ii)(B), Income Tax Regs., to recast the Holdings/CIC and CIC/CIHI transactions because these transactions had economic substance.  Respondent does not contend that the Holdings/CIC transaction lacked economic substance.  Moreover, CIC's and CIHI's conduct established that the terms of their agreement were consistent with the economic substance of the underlying transaction.  See sec. 1.482-1(d)(3)(ii)(B), Income Tax Regs.  In 1996, Carlton contemplated various financing options to acquire RSA and Cinema Media, Ltd.  One of those options was to fund a part of the acquisition internally with

funds from CIHI. On June 28, 1996, CIC and CIHI signed an assumption agreement in which CIC agreed to transfer $49,784,881 to CIHI in exchange for CIHI's assuming all of its obligations relating to the note. Subsequent to the agreement, CIC transferred the $49,784,881 to CIHI, and CIHI began making payments pursuant to the terms of the agreement. Although the note provided that the principal and accrued interest were not due until October 7, 1998, CIHI paid the note in full on November 17, 1997. From June 28, 1996, through November 17, 1997, CIHI performed all of its duties pursuant to the terms of the agreement. Had CIHI not performed all of its duties, CIC had a legal right to enforce the terms of the agreement. Furthermore, petitioners were aware that by delaying repayment of the note they could take advantage of the favorable fluctuations in the currency exchange rates (i.e., the repayment amount could continue to decrease if the dollar strengthened relative to the pound). Petitioners raised, and respondent failed to adequately refute, these factors. Accordingly, we conclude that the contractual terms were consistent with the economic substance of the transaction.

Finally, because the transaction had economic substance, section 1.482-1(f), Income Tax Regs., prohibits respondent from restructuring the terms as if his alternative had been adopted by

petitioners.  More specifically, section 1.482-1(f)(2)(ii),

Income Tax Regs., provides:

> the district director will evaluate the results of a
> transaction as actually structured by the taxpayer
> unless its structure lacks economic substance.
> However, the district director may consider the
> alternatives available to the taxpayer in determining
> whether the terms of the controlled transaction would
> be acceptable to an uncontrolled taxpayer faced with
> the same alternatives and operating under comparable
> circumstances.  In such cases, the district director
> may adjust the consideration charged in the controlled
> transaction based on the cost or profit of an
> alternative as adjusted to account for material
> differences between the alternative and the controlled
> transaction, <u>but will not restructure the transaction</u>
> as if the alternative had been adopted by the taxpayer.
> * * *  [Emphasis added.]

While respondent was not authorized to restructure the

transaction as if petitioners had adopted his proposed

alternative, he could have adjusted the terms of the CIC/CIHI

transaction (e.g., reduced the interest rate).  <u>Id.</u>  Instead,

respondent seeks to collapse two separate transactions (i.e., the

Holdings/CIC and CIC/CIHI transactions), which were 8 years apart

in execution, and create a contractual relationship (i.e.,

between Holdings and CIHI) that never existed.  Accordingly, we

conclude that respondent exceeded his section 482 grant of

authority, and his determination is arbitrary and capricious.

B.   <u>The Economic Substance Doctrine Is Inapplicable</u>

In the alternative, respondent contends that the economic

substance doctrine is applicable because "the transaction was

structured * * * solely to generate an inflated interest

deduction and defer recognition by Petitioner of a currency exchange gain." Respondent further contends that the CIC/CIHI transaction should be restructured because it had no objective economic consequences. Respondent concedes that his economic substance contention is a new matter and, as a result, he bears the burden of proof. We conclude that respondent has failed to carry his burden and that the economic substance doctrine is inapplicable.

In determining whether the CIC/CIHI transaction has sufficient economic substance for tax purposes, the Court must consider both the objective economic substance and the subjective business motivation behind the transaction. See IRS v. CM Holdings, Inc., 301 F.3d 96, 102-103 (3d Cir. 2002). If the transaction has no substance other than to create deductions, it must be disregarded for tax purposes. See United States v. Wexler, 31 F.3d 117, 122 (3d Cir. 1994).

There is no credible evidence that the Holding/CIC and CIC/CIHI transactions were designed solely for the reduction of taxes or that the above-market interest rate alone would have precluded an arm's-length party from entering into a similar transaction. Indeed, petitioners had independent and legitimate business purposes for the CIC/CIHI transaction. As previously discussed in section II.A.2, Carlton decided to fund a portion of the RSA and Cinema Media, Ltd. acquisition with funds from CIHI

and wanted to delay repayment of the note to take advantage of the favorable fluctuations in the currency exchange rates. Respondent failed to adequately refute either purpose. See Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978) (genuine multiple-party transactions with economic substance compelled by business realities, imbued with tax-independent considerations, and shaped not solely by tax avoidance features should be respected for tax purposes); IRS v. CM Holdings, Inc., supra at 102-103.

C.    Deferral of Foreign Exchange Gain

Section 1.1502-13(a)(2), Income Tax Regs., provides that members of a consolidated group can generally defer the recognition of gain relating to intercompany transactions until entering into a transaction with a nonmember.  In 1996, CIC could have retired the note by paying $49,784,881 to Holdings.  Upon repayment of the note, CIC would have recognized a $4,188,791 foreign exchange gain (i.e., on June 28, 1996, CIC could have repaid the principal balance of £29,498,525 with $45,811,209 rather than $50 million).  See sec. 988(a).  This gain, however, was deferred, until 1997, as a result of the CIC/CIHI transaction.  Consistent with our holding, respondent was not authorized, pursuant to section 482 or the economic substance doctrine, to restructure the assumption as the repayment of the loan by CIC, a member of petitioner's consolidated group, to

Holdings, a nonmember, followed by a new loan from Holdings to CIHI.  Because there was an intercompany transaction between CIC and CIHI, pursuant to section 1.1502-13(b)(1)(i), Income Tax Regs., petitioners were entitled to the deferral of foreign exchange gain.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.